659 So.2d 1167 (1995)
Joan B. TAYLOR, Appellant,
v.
VILLAGE OF NORTH PALM BEACH, a Florida Municipal corporation, incorporated under the laws of the State of Florida, Appellee.
No. 93-2569.
District Court of Appeal of Florida, Fourth District.
August 16, 1995.
*1168 Luther Martin Taylor, Palm Beach Gardens, and Michael J. Ryan, Minneapolis, MN, for appellant.
George W. Baldwin and Charles M. Pigott, Lake Park, for appellee.
PARIENTE, Judge.
Appellant landowner appeals an adverse final judgment rejecting her claim that the enactment of the Village of North Palm Beach's 1989 Comprehensive Land Use Plan constitutes a facial taking of her property and finding her as-applied challenge not ripe for review. We agree with the trial court and accordingly affirm its detailed final judgment.

FACTS
The property, Little Munyon Island, is an island in the Intracoastal waterway consisting of 2.562 acres of upland property and 15.114 acres of submerged land. As found by the trial court:
The island is located in the midst of environmentally sensitive resources, including seagrass beds, mangrove, and mud flats which provide a habitat for manatees and other wildlife. There has been no development either on the island or in the surrounding areas since the 1960's.
The title history of the island is complex; however, title apparently passed into landowner's family in 1971 in return for some undocumented legal work performed by landowner's husband, Luther M. "Luke" Taylor. As of the time the lawsuit was first instituted, landowner held title to the property as trustee. When title was first acquired in 1971, North Palm Beach had no comprehensive land use plan. The zoning, designated as C-1A, permitted limited commercial uses and high density, multi-family residential uses. In 1974, North Palm Beach changed the designation of C-1A property, eliminating the residential uses but still permitting limited commercial uses which encompassed office and medical buildings, private schools, hotels, restaurants, marinas and recreational facilities.
The first comprehensive land use plan, adopted in 1975, designated the island's future land use as commercial, as did the 1979 comprehensive land use plan. The 1975 plan, however, contemplated a transition in the permissible uses of the island from commercial to residential with a maximum density of four units. Nevertheless, the zoning continued to be C-1A, although the 1979 plan also contained a map showing the island designated as conservation. While not specifically addressing the island, both the 1975 and 1979 comprehensive land use plans noted the environmentally sensitive nature of the area and impediments to potential development.
Landowner argues that the only feasible use of her property before and after enactment of the 1989 plan would be an intense commercial development such as a combination hotel-marina-restaurant facility similar to Pier 66 in Fort Lauderdale. However, as long as landowner or her husband has held title to the island, neither of them, nor anyone on their behalf, has ever made any substantial attempt to develop the island or made any feasibility studies of the potential uses of the property. The development potential of the island was uncertain even before enactment of the plan in 1989 due to a variety of regulatory constraints. Luke Taylor testified that, long before the adoption of the plan, the U.S. Army Corps of Engineers had made it clear that any effort to intensely develop the island would not be possible and that he had determined that it would be "futile" to proceed with further efforts. This *1169 was the case, despite the fact of Taylor's apparently successful litigation in Askew v. Taylor, 299 So.2d 72 (Fla. 1st DCA 1974), which earned him the right to the fill permit issued in 1975.
Before the enactment of the 1989 plan, the only individual who ever made a significant effort to develop the island met with failure. During the early to mid-1980's, Charles Ball, who had an option to buy the island for more than one million dollars, attempted to develop the property as a marina with over one hundred slips and a clubhouse. In Little Munyon Island, Inc. v. Department of Environmental Regulation, 492 So.2d 735 (Fla. 1st DCA 1986), the first district held that although the predecessor in title of Little Munyon Island had established its right to fill, the state was still permitted other reasonable restrictions on development. After investing more than $225,000 during a period exceeding two and one-half years, Ball abandoned the project when it appeared to him that it was hopeless to obtain the requisite permits from the regulatory agencies involved.
Besides the regulatory roadblocks, development of the island has been subject to numerous practical limitations. Access to the island has always been limited. A bridge from the mainland to the property would have been too expensive, even if regulatory approvals could have been obtained. Further, there is no indication that a road or deep channel could have been built to allow for a more intense commercial use of the property.
Against this backdrop, in 1988 the state legislature enacted the "Local Government Comprehensive Planning and Land Development Regulation Act." § 163.3161, et seq., Fla. Stat. (1989). Consistent with this legislation, North Palm Beach began developing a revised comprehensive land use plan with a required goal of making the plan consistent with the Regional Comprehensive Plan under the authority of the Treasure Coast Council. In the planning stages, the trial court found that:
[North Palm Beach] recognized that the island was privately owned and that the owners had a financial interest in being able to develop the property. On the other hand, [North Palm Beach] also recognized that the island was an undeveloped, pristine component of the Lake Worth estuarine system and that any future use of the island should be consistent with sound ecological and conservation principles.
In November 1989, North Palm Beach adopted a new Comprehensive Land Use Plan (the plan), which changed the island's future land use designation from limited commercial to conservation/open space (C/OS). The plan describes this designation as:
Land uses and activities within land areas "designated" for the primary purpose of conserving or protecting natural resources or environmental quality, and includes areas designated for such purposes, or combinations thereof, as passive recreation, flood control, protection of quality or quantity of ground water or surface water, flood plain management, fisheries management, and/or protection of vegetative community or wildlife habitats.
(Emphasis added). Despite the seemingly restrictive language of the C/OS designation, the urban development planner who drafted this provision for the 1989 plan testified that, in agreeing with the State of Florida to change the designated land use from commercial to conservation/open space, he intentionally added the words "primary" and "passive recreation or combinations thereof" to create some flexibility in terms of the development potential of the property. In 1991, North Palm Beach amended the C/OS zoning classification to add low density single family dwellings as an additional permissible use. Subsequently, the plan was amended with the required approval of the Department of Community Affairs to allow for single-family housing units in the C/OS classification.
The trial court specifically found, based on unrefuted testimony from the professional planner for North Palm Beach, its Director of Public Services, its former Mayor and member of the Village Council at the time the plan was adopted and two professional urban designers, that "following the enactment of the 1989 plan, potential permitted uses [under the existing C/OS designation] included a scaled-down marina, a theme restaurant, *1170 a bed and breakfast facility, a fishing camp or a boat storage facility." Subsequent to the adoption of the plan, landowner never presented North Palm Beach with a plan of proposed development and never sought to have the plan amended to include additional uses.

LANDOWNER'S TAKINGS CLAIM
Landowner brought an action against North Palm Beach in 1991, alleging that her property had been taken without just compensation. In challenging the land use plan in this case, landowner stipulated that the enactment of the plan was a valid exercise of governmental police power; thus, the issue we must decide is not whether the actions of North Palm Beach have been arbitrary or capricious or denied landowner due process of law, but whether landowner's property has been taken by inverse condemnation solely as a result of the change in the designation of the property from limited commercial to conservation/open space.
In a challenge to a regulation, statute or land use plan as a denial of substantive or procedural due process, the focus is on whether there has been an invalid exercise of police power. If proven, the remedy is monetary damages. When the claim is one as here that, while the exercise of the police power was valid, the regulation, statute or land use plan constitutes a taking of the landowner's property, the operative inquiry is whether the landowner has been deprived of all or substantially all economic, beneficial or productive use of the property. See generally City of Pompano Beach v. Yardarm Restaurant, Inc., 641 So.2d 1377, 1384-85 (Fla. 4th DCA 1994), review denied, 651 So.2d 1197 (Fla.), cert. denied, ___ U.S. ___, 115 S.Ct. 2583, 132 L.Ed.2d 832 (1995); see also Tampa-Hillsborough County Expressway Auth. v. A.G.W.S. Corp., 640 So.2d 54, 57-58 (Fla. 1994).
The United States Supreme Court discussed the delicate balance between the right of government to regulate and the right of the citizen to be compensated when private property is effectively taken for public purposes in Dolan v. City of Tigard, ___ U.S. ___, ___, 114 S.Ct. 2309, 2316, 129 L.Ed.2d 304, 315-16 (1994);
The Takings Clause of the Fifth Amendment of the United States Constitution, made applicable to the States through the Fourteenth Amendment, Chicago, B. & Q.R. Co. v. Chicago, 166 U.S. 226, 239 [17 S.Ct. 581, 585, 41 L.Ed. 979] (1897), provides: "[N]or shall private property be taken for public use, without just compensation." [footnote omitted]. One of the principal purposes of the Takings Clause is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960).
.....
On the other side of the ledger, the authority of state and local governments to engage in land use planning has been sustained against constitutional challenge as long ago as our decision in Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922). (Footnotes omitted).
Generally, takings challenges fall broadly into two categories  facial takings claims and as-applied claims. See Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 493, 107 S.Ct. 1232, 1246, 94 L.Ed.2d 472, 491 (1987); Agins v. City of Tiburon, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106, 111-12 (1980); Beacon Hill Farm Assocs. II Ltd. Partnership v. Loudoun County Bd. of Supervisors, 875 F.2d 1081, 1084-85 (4th Cir.1989); Glisson v. Alachua County, 558 So.2d 1030, 1036-37 (Fla. 1st DCA), review denied, 570 So.2d 1304 (Fla. 1990). In a facial takings claim, the landowner maintains that the mere enactment of the regulation constitutes a taking of all affected property without adequate procedures to provide prompt, just compensation. In an as-applied claim, the landowner *1171 challenges the regulation in the context of a concrete controversy specifically regarding the impact of the regulation on a particular parcel of property.

ENACTMENT OF 1989 PLAN AS FACIAL TAKING
A review of the major Supreme Court decisions which address facial challenges demonstrates a willingness to consider an attack of facial unconstitutionality under a just compensation theory but a steadfast unwillingness to in fact find that the "mere enactment" of a given regulation has resulted in a taking of all affected property. See Agins; Keystone; Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc., 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981); Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). In Agins, the Supreme Court enunciated the principle that where the land use ordinance leaves open the possibility of reasonable uses, a facial challenge will be unsuccessful. 447 U.S. at 260-61, 100 S.Ct. at 2141-42. The Supreme Court in Keystone described the battle as "uphill" and a "heavy burden" for a landowner claiming a facial taking. 480 U.S. at 495, 501, 107 S.Ct. at 1247, 1250. The hill may, for all practical purposes, be insurmountable, especially when dealing with land use planning regulations which may have built-in flexibility for allowing an individual landowner to seek an amendment. The reality is that certain facial challenges are impossible to evaluate absent factual information regarding how the statute will be applied. See Southern Pacific Transp. Co. v. City of Los Angeles, 922 F.2d 498, 506 n. 9 (9th Cir.1990), cert. denied, 502 U.S. 943, 112 S.Ct. 382, 116 L.Ed.2d 333 (1991).
Landowner's facial challenge must fail because the C/OS designation does not unequivocally turn the island into a passive park, nor is there a complete ban on development nor can it be said that the residual uses as a matter of law constitute a deprivation of all or substantially all economic, beneficial or productive use of the affected property.[1]Glisson, 558 So.2d at 1037. The trial court properly focused on permissible potential uses which remained after the enactment of the plan in determining that the plan on its face did not result in a de facto taking of landowner's property. Even if the language of the C/OS designation could be read as a prohibition against all economically viable uses, the very nature of the plan, including the plan's established mechanism for seeking an amendment with regard to its application to a particular parcel, runs counter to any contention that the plan constitutes a facial taking. Id.
Landowner further argues that the residual permissible uses found by the trial court are not, in fact, expressly permitted by the C/OS designation under the plan. However, all of the experts, including those responsible for formulating the plan, testified that these uses were permissible under the plan, and we do not find as a matter of law that the plan expressly precludes these uses. Landowner presented no testimony to the contrary.
*1172 Landowner also argues that we should separately consider the submerged land distinct from the uplands portion of her property and find a facial taking of the submerged land has occurred. In addition to the fact that this argument was not made below and that separate treatment of the uplands and submerged lands is unsupported by the record,[2] there is no evidence to indicate that by enactment of the plan landowner has unequivocally lost the right to fill the submerged land or a portion of it or that North Palm Beach has ever prevented landowner from filling the submerged land.
Lastly, landowner argues that even if the residual uses are permissible uses under the plan, they do not constitute economically viable uses of her property given its unique character. However, in order to make that determination, we must proceed from landowner's facial challenge to her as-applied challenge.

AS-APPLIED CHALLENGE TO 1989 PLAN
Not every land use regulation which restricts development of property will entitle a landowner to compensation by government for inverse condemnation, but only regulations which in the words of Justice Holmes, go "too far." Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322, 326 (1922). The difficulty has always been in defining "too far" and determining "the point at which the regulation becomes so onerous that it has the same effect as an appropriation of the property through eminent domain or physical possession." MacDonald, Sommer & Frates v. Yolo County, 477 U.S. 340, 349, 106 S.Ct. 2561, 2566, 91 L.Ed.2d 285, 295 (1986) (quoting Williamson County Regional Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 199, 105 S.Ct. 3108, 3123, 87 L.Ed.2d 126, 147 (1985)); Glisson v. Alachua County, 558 So.2d 1030, 1034 (Fla. 1st DCA), review denied, 570 So.2d 1304 (Fla. 1990). This is why most challenges to enacted ordinances and regulations require that the landowner seek a final determination from the government as to the permissible uses of the property before resorting to the judicial forum.[3]
We agree with the trial court and with North Palm Beach that the failure of landowner to request an amendment to the plan to permit other uses and present North Palm Beach with a meaningful development proposal is fatal to her takings claim as *1173 applied to her property. The ripeness doctrine, which requires a claimant to exhaust administrative remedies before resorting to a judicial solution, is not just a technical requirement; it has a very practical application to takings cases.[4] As the trial court correctly noted:
One of the difficulties with analyzing this case is that it does not involve a concrete development proposal for the property. Plaintiff is taking the position that the mere enactment of the plan constituted a taking. Unlike the plaintiff in Vatalaro v. Department of Environmental Regulation, 601 So.2d 1223 (Fla. 5th DCA 1992), Plaintiff has not actually sought a permit or approval from any agency for a proposed development. It is difficult to speculate on what type of development might be allowed by Defendant or whether any other regulatory entities would place road-blocks to development, regardless of Defendant's zoning or land use classification.
A governmental entity must arrive at a "final, definitive position," Williamson County Regional Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 191, 105 S.Ct. 3108, 3119, 87 L.Ed.2d 126, 141 (1985), on the "nature and extent of permitted development" before a court may adjudicate the "constitutionality of the regulations that purport to limit it." MacDonald, Sommer & Frates, 477 U.S. at 351, 106 S.Ct. at 2567. Florida courts have adopted the federal ripeness policy of requiring a "final determination from the government as to the permissible uses of the property." Glisson, 558 So.2d at 1035-36; Department of Envtl. Reg. v. MacKay, 544 So.2d 1065, 1066 (Fla. 1989); City of Jacksonville v. Wynn, 650 So.2d 182, 186-88 (Fla. 1st DCA 1995); Lee County v. Morales, 557 So.2d 652 (Fla. 2d DCA), review denied, 564 So.2d 1086 (Fla. 1990). A final determination requires at least one meaningful application. Glisson, 558 So.2d at 1035. As we recently noted, "[r]ipeness requires a firm delineation of permitted uses so that the extent of the taking can be analyzed." Tinnerman v. Palm Beach County, 641 So.2d 523, 526 (Fla. 4th DCA 1994).
The trial court properly recognized that the requirement of ripeness enhances the potential for an administrative or political resolution of a dispute, without the need for intervention by a court and additionally assists the trial court in determining whether a taking has occurred. As we explained in Tinnerman, the ripeness doctrine serves two functions:
First, the doctrine recognizes decisions are subject to change based on input from various and competing interests. It provides for an administrative or political resolution to disputes. Second, the ripeness requirement of a "final decision" enables a court to determine whether a taking has occurred and, if so, its extent. Without a final decision, it is impossible to determine whether the land has retained any reasonable beneficial use, or if expectation interests have been destroyed. Williamson, 473 U.S. at 189-91 n. 11, 105 S.Ct. at 3118 n. 11.
641 So.2d at 525.
As the trial court stated in its decision:
Sound policy, therefore, requires courts to enforce the ripeness requirement. The hard and final decision of how much development will be allowed must be made at the governmental level before a court can *1174 analyze that decision to see if it has effected a compensable taking. A final decision can be forced by a court requiring the landowner to take the necessary steps at the administrative level. One measure of an owner's reasonable economic expectation for property is an owner's proposed use of property ... A reasonable investment based expectation could, in part, be gauged by what was sought. In this case, the ripeness requirement prevents this court from making a decision on the application of the 1989 Plan in the abstract. The better policy is to require plaintiff to seek a final decision on the 1989 Plan at the agency level before allowing intervention by a court.
Landowner erroneously relies on Reahard v. Lee County, 968 F.2d 1131 (11th Cir.1992), in support of her takings claim. In Reahard, the plaintiff, prior to bringing the action, had applied for and the county had denied an application for an amendment to the plan, an application for administrative determination of error and an application under the use or single family residence provision of the plan and thus, had exhausted all administrative remedies. The Reahard court reaffirmed the ripeness requirement set forth in Eide v. Sarasota County, 908 F.2d 716, 720-21 (11th Cir.1990), cert. denied, 498 U.S. 1120, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991), noting that the "impact and interference [with investment-backed expectations] cannot be ascertained until the local authority has determined the nature and extent of the development that will be permitted." Reahard, 968 F.2d at 1135 n. 7.
By comparison to Reahard, here landowner has not filed "one meaningful application" specifying her proposed uses for the property. See Glisson. Further, we do not find that the evidence compels a finding that any attempt at amendment would be futile, especially in light of the fact that North Palm Beach has already amended the plan to expand the available uses by adding single-family residential units as an additional permissible use. See Tinnerman; City of Key West v. Berg, 655 So.2d 196 (Fla. 3d DCA 1995). Accordingly, we agree that landowner's takings claim, as applied to her property, is not ripe for review.

CONCLUSION
While the scope of permissible zoning may have been curtailed over a twenty-year period, the 1989 plan does not constitute a facial taking and therefore landowner's facial challenge to the plan must fail. As to landowner's as-applied challenge, landowner's claim is not ripe for review because she did not seek to amend the plan, nor she did submit a meaningful application for a proposed development. Likewise, landowner did not established that any present attempt at a reasonable development proposal would be doomed to failure ab initio, so as to excuse the exhaustion of the administrative remedies requirement. For these reasons, the judgment of the trial court is affirmed.
WARNER, J., and SMITH, FREDRICKA, Associate Judge, concur.
NOTES
[1] We note that Judge Altenbernd has distinguished between the standard in a per se takings case where there must be a deprivation of "all" economic use and the standard of a "substantial" deprivation where an as-applied challenge is being made. Tampa-Hillsborough County Expressway Auth. v. A.G.W.S. Corp., 608 So.2d 52, 57 n. 10 (Fla. 2d DCA 1992) (Altenbernd, J., dissenting), review granted, 621 So.2d 433 (Fla. 1993), decision quashed, 640 So.2d 54 (Fla. 1994); see generally Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 500-01, 107 S.Ct. 1232, 1250, 94 L.Ed.2d 472, 498 (1987). This distinction appears to be a logical one because a facial taking is found only when the mere enactment of the act or regulation constitutes a taking of all affected property. On the other hand an as-applied challenge requires a fact-intensive inquiry of the impact of the regulation on the economic viability of the landowner's property by analyzing permissible uses before and after the enactment of the regulation. This set of facts then provides a framework for allowing a fact-finder to reach a conclusion as to whether there has been a "substantial" deprivation of uses as applied to the particular landowner's property.

While there is legal and logical support for requiring a landowner making a per se challenge to show that there has been a per se deprivation of all economic use of all affected property, in this case we need not resolve whether a different standard should be used in facial takings cases because in this case, the mere enactment of the plan did not unlawfully deprive landowners, whose land was designated C/OS, of either all or substantially all economic or productive use of their property.
[2] In her brief and in oral argument, landowner actually concedes that the uplands portion of the property is not ripe for review, but contends that because she cannot fill the submerged land, a taking of that portion has occurred and to seek relief through the administrative process would be futile as to the submerged lands portion. Besides the fact that landowner did not argue below that the property should be treated separately to allow the trial court to make a factual determination on this issue, the record does not demonstrate that the uplands portion and submerged land portion should be treated other than as a unitary parcel for inverse condemnation purposes. See Department of Envtl. Reg. v. Schindler, 604 So.2d 565 (Fla. 2d DCA), review denied, 613 So.2d 8 (Fla. 1992). The two parcels historically have been treated as one parcel. The fact that the two parcels are physically contiguous raises a presumption that the property should be treated as one unit, a presumption that landowner did not rebut. Department of Transp. v. Jirik, 471 So.2d 549, 553 (Fla. 3d DCA 1985), decision approved, 498 So.2d 1253 (Fla. 1986).
[3] We did not consider ripeness as an absolute bar to consideration of landowner's facial challenge because, based on Supreme Court precedent the ripeness doctrine has generally not been applied to facial challenges. See Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987); Agins v. City of Tiburon, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980); Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). The rationale for not requiring the landowner to first resort to the administrative process, while never clearly enunciated, most likely stems from the differing character of a facial challenge where the courts focus on the issue of whether the "mere enactment" constitutes a taking of every affected parcel of land and do not specifically focus on its application to the property in question. See also Beacon Hill Farm Assocs. II Ltd. Partnership v. Loudoun County Bd. of Supervisors, 875 F.2d 1081, 1084-85 (4th Cir.1989); Eide v. Sarasota County, 908 F.2d 716, 724 n. 14 (11th Cir.1990); compare Southern Pacific Transp. Co. v. City of Los Angeles, 922 F.2d 498, 505-06 (9th Cir.1990), cert. denied, 502 U.S. 943, 112 S.Ct. 382, 116 L.Ed.2d 333 (1991). We note, however, that one Florida case has applied the ripeness doctrine to a facial just compensation challenge. See Estate of Tippett v. City of Miami, 645 So.2d 533 (Fla. 3d DCA 1994), review dismissed, 652 So.2d 819 (Fla. 1995).
[4] It should be noted that recent legislation, effective October 1, 1995, has altered the ripeness requirement for cases involving governmental regulation of private land use. Ch. 95-181, Laws of Fla. The legislation is, however, prospective and does not apply to rules, regulations or ordinances previously enacted and thus would not be applicable to landowner's claim.

By this legislation, the legislature has created a cause of action protecting landowners against governmental laws, regulations and ordinances which as applied "inordinately burden, restrict, or limit private property rights," even if the action does not amount to a taking under the Florida Constitution or the United States Constitution. In order to maintain a cause of action under this new legislation, the landowner files a claim with the head of the responsible governmental entity or entities, after which the entity or entities must, within 180 days, make a settlement offer or issue a written ripeness decision, identifying the permissible uses to which the subject property may be put. The statute expressly states that the written ripeness decision, "as a matter of law, constitutes the last prerequisite to judicial review, and the matter shall be deemed ripe or final for purposes of the judicial proceeding created by this section."