999 So.2d 718 (2008)
Rodney SHANDS, Robert Shands, Kathryn Edwards, and Thomas Shands, Appellants,
v.
CITY OF MARATHON, etc., and the Marathon City Council, Appellees.
No. 3D07-3288.
District Court of Appeal of Florida, Third District.
December 31, 2008.
*720 Steven Geoffrey Gieseler and Valerie A. Fernandez and Nicholas M. Gieseler (Stuart), for appellants.
Johnson, Anselmo, Murdoch, Burke, Piper & Hochman and Michael T. Burke, for appellees.
Before GERSTEN, C.J., and SUAREZ and CORTIÑAS, JJ.
SUAREZ, J.
Rodney Shands, Robert Shands, Kathryn Shands Edwards, and Thomas Shands, [collectively, "the Shands"] seek to reverse a final order granting the City of Marathon's ["City"] motion to dismiss in an inverse condemnation case. The trial court's order dismissed the Shands' state claim finding the cause of action to be a facial taking brought beyond the applicable four-year statute of limitations and also dismissed the Shands' federal claim as not ripe. We reverse and remand as the Shands' state claim is an as-applied taking claim, not a facial taking claim, and was brought within the appropriate four-year statute of limitations, and the federal claim is ripe.
Dr. R.E. Shands purchased the 7.9-acre Little Fat Deer Key in 1956, and seven acres of adjacent bay bottom in 1959, before any state land use policies existed. He died in 1963, and his wife inherited the *721 property, now known as Shands Key. She conveyed title to their children, the appellants, in 1985. From the time it was purchased until 1986, Shands Key was within Monroe County jurisdiction and was zoned General Use.[1]
In 1986, Monroe County adopted the State Comprehensive Plan and development regulations that altered Shands Key's zoning status to Conservation Offshore Island (OS), and placed it in the Future Land Use category.[2] When the City of Marathon incorporated in 1999, it adopted the 1986 Monroe County comprehensive land use plan, and Shands Key was within the City bounds. In 2005, the City adopted the City of Marathon Comprehensive Plan; the land use and zoning designations of Shands Key remained unchanged.[3]
In 2004, the Shands filed an application for a dock permit. The application was denied, referring to the City's prohibition on development in areas classified as high quality hammocks, or areas with known threatened or endangered species.[4] The Shands then filed a Beneficial Use Determination (BUD) application as required by the City of Marathon Code of Ordinances, Article 18.[5] The Special Master at the *722 conclusion of the BUD hearing found that the Shands had reasonable economic investment-backed expectations that they could build a family residence on the Key, as planned in the late 1950s. The Special Master recommended that the City grant a building permit for a single family home exempt from the Rate Of Growth Ordinance (ROGO) requirements of 0.1 units per acre,[6] or purchase the property for a mutually agreeable sum. After a public hearing, the Marathon City Council rejected the Special Master's recommendations and denied the Shands' BUD application.
The Shands then brought suit against the City, claiming that the City's acts resulted in an as-applied regulatory taking of their property without just compensation, in violation of state and federal law.[7] The circuit court dismissed the Shands' state claim, in essence concluding that the cause of action was for a facial[8] taking and, as such, was now barred by the four-year statute of limitation for inverse condemnation claims.[9] The court also found that the Shands' federal claim was not ripe because the complaint failed to allege that the Shands had previously sought, and been denied, relief under state law. The Shands have appealed, and we reverse.
The initial issue presented is whether the Shands' property has been taken through inverse condemnation, and if so, to what extent.[10] Is the taking solely as a result of the change in zoning classification of the property by the 1986 adoption by Monroe County of the State Comprehensive Plan, or is it by the City's 1999 *723 adoption of Monroe County's current land development regulations ["LDRs"]?[11] To determine whether there is a taking, we must first analyze whether the landowner has been deprived of all or substantially all economic, beneficial or productive use of the property. Taylor v. Village of North Palm Beach, 659 So.2d 1167, 1170 (Fla. 4th DCA 1995) (citations omitted). If a taking has occurred, it then remains to be determined whether adequate compensation was provided.
Only two relatively narrow regulatory actions are deemed to be categorical, facial takings  those involving physical invasion of property (not the case here), or, as is the issue in this case, those resulting in a total regulatory taking. See Lucas, 505 U.S. at 1017, 112 S.Ct. 2886. A facial, or categorical, taking occurs when the mere enactment of the regulation precludes all development, and constitutes a taking of all economically beneficial use of a party's land. Lost Tree Village Corp. v. City of Vero Beach, 838 So.2d 561, 572 (Fla. 4th DCA 2002). The standard of proof for a facial taking is whether the regulation has resulted in deprivation of all economic use. Taylor, 659 So.2d at 1167. Deprivation of economic value is limited to "the extraordinary circumstance where there is no productive or economically beneficial use of the land" permitted. Lucas, 505 U.S. at 1017, 112 S.Ct. 2886. "The categorical rule of no use would not apply if the diminution in value were 95% rather than 100%." Lucas, 505 U.S. at 1019-20 n. 8, 112 S.Ct. 2886. Thus, if the land use regulations provide a mechanism by which a landowner can obtain a variance or transferrable development rights, then the regulations do not deny the landowner of all economically viable use of property and there is no facial taking. See Lucas, 505 U.S. at 1019-20 n. 8, 112 S.Ct. 2886 ("Anything less than a complete elimination of value or a total loss ... would require the kind of analysis applied in Penn Central.").[12]
In an as-applied taking claim, the landowner challenges the specific impact of the regulation on a particular property. The standard of proof for an as-applied taking is whether there has been a substantial deprivation of economic use or reasonable investment-backed expectations. Taylor, 659 So.2d at 1167. This requires a "fact-intensive inquiry of impact of the regulation on the economic viability of the landowner's property by analyzing permissible uses before and after enactment of the regulation." Id. at 1174 n. 1; see, Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); see also Palazzolo v. Rhode Island, 533 U.S. 606, 617, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) ("[w]here a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on a complex of factors including the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action"); Glisson v. Alachua County, 558 So.2d 1030, 1037 (Fla. 1st DCA 1990) (holding that diminution in value of the property is not the test, rather, it is incumbent on the landowner to demonstrate that *724 he has been denied all or a substantial portion of the beneficial uses of his property.); Golf Club of Plantation, Inc. v. City of Plantation, 717 So.2d 166, 170 (Fla. 4th DCA 1998) (overview of federal takings analysis).
The Shands assert an as-applied taking but use language applicable to a facial taking standard of proof ("all reasonable economic use"). The City argues a facial taking, yet the record indicates that not all economic value was or has been eliminated. We apply the analysis set forth in Lucas. First, were the Shands denied all economically beneficial use of the property as a result of the regulations? Lucas at 1015, 112 S.Ct. 2886. When Monroe County adopted the State Comprehensive Plan in 1986, the zoning designation of Shands Key was changed from GU to OS. See Art. VII, sec. 9.5-212, Monroe County Ordinance, No. 33-1986 (1986). The OS designation, however, permitted "low intensity residential uses ... that can be served by cisterns, generators and other self-contained facilities." Id.; see also sec. 9.5-241(a)(1), Monroe County Ordinance (1986) ("the following uses are permitted as of right in the Offshore Island District: Detached residential dwellings"). Transfer of Development Rights ["TDR"][13] and ROGO[14] allocation points were also available. Thus, the mere enactment of the ordinances at issue did not eliminate all economically beneficial use of the property.[15]
Second, did the Shands have distinct investment-backed expectations? Lucas, 505 U.S. at 1019 n. 8, 112 S.Ct. 2886, citing to Penn Central Transp. Co. v. New York City, 438 U.S. at 104, 98 S.Ct. 2646. Although R.E. Shands bought the property in 1956 with the idea to eventually build a family home on it, the Shands family's "investment-backed expectations" were minimal at best. The Shands had no specific development plan and only recently sought a dock permit. To be sure, they had not pursued any development of the property since it was purchased in 1956. "A subjective expectation that land can be developed is no more than an expectancy and does not translate into a vested right to develop the property.... If the landowners did not start development prior to the enactment of these land regulations, they acted at their own peril in relying on the absence of zoning ordinances." Monroe County v. Ambrose, 866 So.2d 707, 711 (Fla. 3d DCA 2003). Indeed, the Shands inherited the property, and have not shown any substantial personal financial investment in Shands Key. Although this is not a test for the legitimacy of a takings claim,[16] it does emphasize the Shands' difficulty *725 in demonstrating that they had any reasonable expectation of selling Shands Key for residential development, or that they have suffered any substantial loss as a result of the regulations.[17] Therefore, no facial taking has occurred.
In summation, the Appellants' cause of action for inverse condemnation does not state a categorical, facial takings claim, because the mere enactment of the 1986 State Comprehensive Plan, or the City's subsequent adoption of the 2010 Comprehensive Plan, did not preclude all economic use and value. While it is true that a development moratorium on such high quality hammock land as Shands Key precluded building on it,[18] it is also true that the availability of ROGO allocation points and TDRs for at least six acres of the upland portion of the Key suggests that some, perhaps not insignificant, economic value remains. See Lucas, 505 U.S. at 1019-20 n. 8, 112 S.Ct. 2886; see also Bernardsville Quarry v. Bernardsville Borough, 129 N.J. 221, 608 A.2d 1377 (1992) (holding that regulatory restrictions do not result in a taking even though they reduce income or profits, so long as they allow a just and reasonable return on investment). We conclude that the facts in this case present an as-applied taking cause of action.
As an as-applied taking claim, we first determine that the Shands' federal claim is ripe for review, contrary to the trial court's conclusion. "Florida courts have adopted the federal ripeness policy." Taylor, 659 So.2d at 1173. An as-applied takings claim challenging the application of a land use ordinance is not ripe until the plaintiff has obtained a final decision regarding the application of the regulations to the plaintiff's property. The Shands obtained a decision as to the application of the regulations to the property when they went through the BUD process and obtained a decision from the Marathon City Council. See, Palazzolo, 533 U.S. at 618, 121 S.Ct. 2448; Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 186, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985); see also Lost Tree Village, 838 So.2d at 570 (providing that when a regulatory takings claim is ripe, it becomes clear that the agency lacks the discretion to permit any development, or the permissible uses of the property are known to a reasonable degree of certainty). We also conclude that, because of the legitimate development moratorium in place at the time, the City of Marathon had no discretion to grant a variance.[19]See Palazzolo, 533 U.S. at 620, 121 S.Ct. 2448.
*726 The City's determination is also final. A "final determination" requires at least one meaningful application. Glisson, 558 So.2d at 1035. The Shands did this by filing for a dock permit, and when denied, by appropriately filing the required BUD application with the government entity charged with implementing the regulations. The BUD process is in place to determine to what uses the property may reasonably be put under the current land use regulations. The Marathon City Council's decision to reject the Special Master's BUD recommendation was final.[20] Neither party has suggested any less intense use might garner a variance from the Council. We must conclude that it was futile, under the regulatory conditions prevailing at the time, for the Shands to seek further permits to develop the property.[21] Therefore, the federal claim was ripe and should not have been dismissed.
Given the foregoing analysis, we agree with the Shands that the trial court erroneously dismissed both the state and federal claims. A motion to dismiss a complaint based on the expiration of the statute of limitations should be granted "in extraordinary circumstances where the facts constituting the defense affirmatively appear on the face of the complaint and establish conclusively that the statute of limitations bars the action as a matter of law." Alexander v. Suncoast Builders, Inc., 837 So.2d 1056, 1057 (Fla. 3d DCA 2002) (quoting Rigby v. Liles, 505 So.2d 598, 601 (Fla. 1st DCA 1987)). As this is not a claim for a facial taking, but an as applied taking, it follows that the statute of limitations did not begin to run until February 27, 2007, when the City of Marathon rejected with finality the Special Master's BUD recommendation and denied the Shands' BUD application,[22] and thus the *727 Shands' state claim was timely filed within the four-year statute of limitations provided by section 95.11(3)(p), Florida Statutes (2007). We therefore also reverse the trial court's order granting the City of Marathon's motion to dismiss the Shands' state claim.
It is important to note that the only issue before this court is the issue of whether the trial court correctly dismissed the Shands' claims for failure to file within the appropriate statute of limitations. On remand, it remains for the trial court to determine whether, given the Shands' economic expectations, the City's denial of the BUD application rises to the level of a compensable as-applied taking under state and federal law. The trial court must determine whether, and what, compensation is to be made under the circumstances, whether the City must grant TDRs equivalent to the buildable upland property[23] or purchase the property outright.[24] We thus reverse, in its entirety, the order dismissing the Appellants' state and federal claims, and remand to the trial court for further proceedings consistent with this opinion.
Reversed and remanded.
NOTES
[1] The General Use category allowed for development of one unit per acre.
[2] In 1985, the legislature enacted a State Comprehensive Plan, effective July 1, 1985, ch. 85-57, 1985 Fla. Laws 295 (codified as amended at Fla. Stat. ch. 187 (2000)); in 1986, the State Comprehensive Plan was adopted by Monroe County. This effectively altered the zoning classification of Shands Key from General Use (GU) to Conservation-Offshore Island (OS), which reduced allowable development to 1 unit per 10 acres. See Sec. 9.5-212. Purpose of the Offshore Island District (OS): The purpose of the OS district is to establish areas that are not connected to U.S. 1 as protected areas, while permitting low-intensity residential uses and campground spaces in upland areas that can be served by cisterns, generators and other self-contained facilities. (Monroe County Code, Ord. No. 33-1986, § 9-112; Ord. No. 40-1987, § 54).
[3] See Code of Ordinances, City of Marathon, Florida, Ordinance No. 2007-37, enacted January 8, 2008. Section 103.07. Conservation Districts....

B. Conservation-Offshore Island (C-OI) Zoning District: The Conservation-Offshore Island (C-OI) Zoning District implements the Conservation designation on the Future Land Use Map and this zoning district shall be used for properties which have natural limitations to development because of their sensitive environmental character. Sewage disposal and potable water service shall comply with all applicable Health Department requirements and environmental standards.
[4] City of Marathon, Florida, Ordinance 2004-15, (July 2004); State of Florida, Dept. of Comm. Affairs Final Order DCA04-OR-189 (2004) (finding Ordinance 2004-15 extending the 2003 development moratorium on certain high quality natural areas to be consistent with §§ 380.05(6), 380.0552(9), Fla. Stat. (2003) (Florida Keys Area of Critical State Concern)). See also City of Marathon, Ordinance 2003-10 (June 2003).
[5] City of Marathon Code of Ordinances, Art. 18, Beneficial Use Determinations. Section 102.99 (2008). Purpose and Intent.

A. If a landowner in the City has applied for and been denied a development permit and is of the opinion all beneficial use of the landowner's property has been denied by applying the LDRs, the procedures listed in this section shall be used prior to seeking relief from the courts in order that any denial of beneficial use of property may be remedied through a non-judicial forum.
B. The beneficial use determination is a process by which the City evaluates the allegation that no beneficial use remains and can provide relief from the regulations by granting additional development potential, providing just compensation or if it so determines, extending a purchase offer for the property. However, this article also intends that such relief not increase the potential for damages to health, safety, or welfare of future users of the property or neighbors that might reasonably be anticipated if the landowner were permitted to build.
[6] See Ch. 107, City of Marathon Code of Ordinances (2008); § 9.5-262, Monroe County Code, Table: Maximum Residential Density and District Open Space: OS equivalent to .1 Allocated Density DU/Acre. See also Policy Document-Monroe County Year 2010 Comprehensive Plan, Ch. 3, Goals, Objectives and Policies, Policy 101.5.4 (1999).
[7] Florida's constitution states that no private property shall be taken except for a public purpose and with full compensation paid to each owner. Art. X, § 6(a), Fla. Const. There is no dispute that the State, County and City land use regulations at issue are facially valid. The Shands have not challenged their constitutionality, but merely seek damages pursuant to a taking claim. See Glisson v. Alachua County, 558 So.2d 1030, 1037 (Fla. 1st DCA 1990) ("Application of the test for determining the facial validity of a regulation demonstrates that ... the contested regulations substantially advance legitimate state interests, in that the regulations are directed to protection of the environment and preservation of historic areas.").
[8] The word "facial" is a term of art more properly applied when evaluating the constitutional validity of a statute, regulation or ordinance, as in whether the ordinance is constitutional "on its face." This is a separate analysis from whether the regulation has, by its enactment, effected a "taking." We use the term "facial," however, following the usage made by the parties, but point out that in this context the term refers to a categorical, per se, taking, as used in Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).
[9] § 95.11(3)(p), Fla. Stat. (2007). The catch-all four-year statute of limitations found within section 95.11(3)(p) has been held to govern inverse condemnation actions. Sarasota Welfare Home, Inc. v. City of Sarasota, 666 So.2d 171, 172 (Fla. 2d DCA 1995). The State argues that the Shands' inverse condemnation claims accrued in 1986, when Monroe County changed the land use designation and zoning of Shands Key, or at the latest in 1999, when the City adopted these regulations.
[10] See Osceola County v. Best Diversified, Inc., 936 So.2d 55, 60 (Fla. 5th DCA 2006) ("Inverse condemnation is a cause of action by a property owner to recover the value of property that has been de facto taken by an agency having the power of eminent domain where no formal exercise of that power has been undertaken.").
[11] "Land development regulations" include local zoning, subdivision, building and other regulations controlling the development of land. § 380.031(8), Fla. Stat. (2003).
[12] Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (considering the economic impact of the regulation on the claimant, and the extent to which the regulation has interfered with distinct investment-backed expectations).
[13] See Article 3, Transfer of Development Rights, Section 107.19, City of Marathon Code of Ordinances (2007). See also OFP, L.L.C. v. State, 395 N.J.Super. 571, 930 A.2d 442 (2007) ("A TDR program is a land use tool that permits a public agency to use market forces to encourage the transfer of development potential from areas the agency wants to preserve ... to areas that are more appropriate for growth.... Landowners ... may obtain compensation in the form of TDR credits for restricting development on their properties. Payment for this lost development potential comes from purchasers who buy TDR credits, which then entitle the purchasers to build in [another] zone at a greater density than permitted by the underlying zoning.").
[14] See Ch. 107, City of Marathon Code of Ordinances (2007).
[15] Whether the 2003-2004 City moratorium on building in environmentally sensitive lands operates as a temporary taking was not raised below and we do not address it here.
[16] See Palazzolo, 533 U.S. at 634-635, 121 S.Ct. 2448 (O'Connor, J., concurring) ("We... have never held that a takings claim is defeated simply on account of the lack of a personal financial investment by a ... donee, heir, or devisee.").
[17] Some cases suggest that, in these circumstances, "justice and fairness" do not require that the Shands be compensated. Penn Central, 438 U.S. at 124, 98 S.Ct. 2646 quoting Goldblatt v. Hempstead, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962), indicating that, to the contrary, it seems that any compensation would constitute a "windfall." See Palazzolo, 533 U.S. at 635-636, 121 S.Ct. 2448 (O'Connor, J., concurring) (discussing the nature of the test for "reasonableness" of a property owner's expectations).
[18] See Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 320, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (affirming the decision of the Ninth Circuit Court of Appeals finding that the temporary moratorium imposed by the Tahoe Regional Planning Agency on "virtually all development on a substantial portion of the property subject to [the Agency's] jurisdiction" while the Agency developed a "comprehensive land-use plan" did not effect a taking under the Penn Central factors, and rejecting the petitioner's argument that a temporary deprivation of all economically viable use compelled a finding that a categorical [facial] taking occurred).
[19] See Fig. XXX-XXX-X of City Ordinance (indicates that Council decision on a BUD is a final decision only appealable to the Department of Community Affairs [DCA] w/n 45 days, pursuant to Ch. 380, Fla. Stat.); accord Friends of Everglades, Inc. v. Bd. of County Comm'rs of Monroe County, 456 So.2d 904, 909 (Fla. 1st DCA 1984) (finding that Ch. 380 does not abrogate citizen's right to challenge local zoning decisions in circuit court; review of local zoning matters not exclusive to Florida Land and Water Adjudicatory Comm'n (FLWAC)); Upper Keys Citizens Ass'n, Inc. v. Monroe County, 467 So.2d 1018, 1020 n. 3 (Fla. 3d DCA 1985) ("re-affirming the right of a litigant to go into the circuit court directly, pursuant to such rights which may flow from Section 21 of the Declaration of Rights of the Florida Constitution (1968)"); Section 100.09. Other Regulatory Authority.... Where applicable, pursuant to Fla. Stat. ch. 380, the Department of Community Affairs has appeal authority over actions taken by the City.
[20] Section 102.104. Final Determination by Council.

The Council is the only entity which has final authority to grant or deny beneficial uses subject to appeal by DCA under Chapter 380. In approving, denying or modifying an order from a Hearing Officer granting or denying an applicant beneficial use, the Council will ensure that the Hearing Officer has conducted the evidentiary hearing in a manner that is consistent with this article and the Comprehensive Plan. The Council will approve or reject the Hearing Officer's determination during a public hearing. The public shall be given the opportunity to be heard and make arguments for or against the determination during the Council's public hearing. Ch. 102, City of Marathon Code of Ordinances (2008).
[21] See City of Marathon, Ordinance 2004-15, approved, DCA04-OR-189 (Sept. 2004); Ordinance 2005-14, approved, DCA05-OR-146 (Aug. 2005); Ordinance 2006-26 (unclear whether DCA approved). Whether the building moratorium currently remains in place is not contained in the record. If it does not, the possibility of the Shands re-applying for a limited residential use may render their takings claim void, although permits to build in environmentally sensitive lands are afforded last priority.
[22] See Suitum v. Tahoe Regional Planning Agency, 520 U.S. 725, 733-34, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997) ("There are two independent prudential hurdles to a regulatory takings claim brought against a state entity in federal court...." [A] plaintiff must demonstrate that she has both received a `final decision regarding the application of the [challenged] regulations to the property at issue' from `the government entity charged with implementing the regulations,' and `sought compensation through the procedures the State has provided for doing so....' The first requirement follows from the principle that only a regulation that "goes too far," results in a taking under the Fifth Amendment. The second hurdle stems from the Fifth Amendment's proviso that only takings without "just compensation" infringe that Amendment; `if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation.') (citations omitted)
[23] See Suitum, 520 U.S. at 749-750, 117 S.Ct. 1659 (Scalia, J. concurring) ("TDRs can serve a commendable purpose in mitigating the economic loss suffered by an individual whose property use is restricted, and property value diminished, but not so substantially as to produce a compensable taking. They may also form a proper part, or indeed the entirety, of the full compensation accorded a landowner when his property is taken.").
[24] The City Code specifically provides for this, but only if it is found that the landowner has been denied ALL reasonable economic use. This language suggests that only in a Lucas-type of categorical taking can the City compensate with TDRs or purchase: Ch. 102, Article 18, Beneficial Use Determinations, § 102.103, City of Marathon Code of Ordinances (2008), Granting Relief:

A. Recommendation: If the finding made under this subdivision is that a landowner has been denied all reasonable economic use of the property, and only if all reasonable economic use of the property has been denied, the Hearing Officer shall recommend relief be granted. The remedies available to an applicant for beneficial use will include issuance of a permit or just compensation by purchase of all or some of the lots or parcels or purchase of the development rights (leaving the lot in private ownership) at the fair market value immediately prior to the comprehensive plan or land development regulations in effect at the time of the filing of the beneficial use application, or any other relief the City determines appropriate and adequate to prevent a taking. The Hearing Officer may also find that there has been no taking. [emphasis supplied]
B. Minimum Increase: In granting relief, the landowner may be given the minimum increase in use intensity or other possible concessions from this chapter to permit a beneficial use of the land. The highest use is not required or intended as the appropriate remedy, but shall be limited to the minimum economic use of the property necessary to avoid a taking within a reasonable period of time as established by applicable law. [emphasis supplied]