# Third District Court of Appeal

## State of Florida

Opinion filed September 14, 2016.

_____

No. 3D12-777
Lower Tribunal No. 05-313-M

_____

**Charles N. Ganson, Jr., as Personal Representative
of the Estate of Molly Beyer,**
Appellant,

vs.

**City of Marathon, Florida,
and the State of Florida,**
Appellees.


An Appeal from the Circuit Court for Monroe County, Ruth Becker, Judge.

James S. Mattson; Andrew M. Tobin; Pacific Legal Foundation and Mark Miller and Christina M. Martin (Palm Beach Gardens), for appellant.

GrayRobinson, P.A., and John R. Herin, Jr., and Jeffrey T. Kuntz (Fort Lauderdale), for the City of Marathon; Pamela Jo Bondi, Attorney General, and Jonathan A. Glogau (Tallahassee), Special Counsel Chief, for the State of Florida.


Before SUAREZ, C.J., and WELLS and LAGOA, JJ.

ON MOTION FOR REHEARING

PER CURIAM.

Denied.

SUAREZ, C.J., and WELLS, J., concur.

LAGOA, J., would grant rehearing.

Before SUAREZ, C.J., and WELLS, SHEPHERD, ROTHENBERG, LAGOA, SALTER, EMAS, FERNANDEZ, and LOGUE, JJ.

ON MOTION FOR REHEARING EN BANC

PER CURIAM.

Denied.

SUAREZ, C.J., and WELLS, ROTHENBERG, SALTER, FERNANDEZ, and LOGUE, JJ., concur.

SHEPHERD, J., dissenting.

This is a significant regulatory takings case, the holding of which is that a local government can regulate private property to an extent that is functionally comparable to the classic physical taking—without paying just compensation—so long as it does so incrementally over a period of time. This cannot be, and indeed is not, the law. I respectfully dissent from the denial of the Beyers' motion for rehearing *en banc*, and write to explain my disagreement with this Court's willingness to dispense with applicable Takings Clause precedent to reach a result that is contrary to the constitutional principle that excessive economic injuries caused by government action be compensated.

2

## BACKGROUND

The following is a chronology of the salient facts:

- **1970**: Gordon and Molly Beyer purchased an undeveloped island in Monroe County (the "County") for $70,000. At the time of purchase, the island was zoned "General Use," which allowed one single-family home per acre. The property is just under nine acres.

- **1986**: The County adopted a Comprehensive Land Use Plan (the "1986 Plan") that downzoned the Beyers' property to "Offshore Island," allowing a new development density of one unit per ten acres. Since the Beyers' property is less than ten acres, this 1986 Plan essentially eliminated their development possibilities.

  The 1986 Plan included an administrative process known as a "Beneficial Use Determination." This process provided landowners with a means of challenging the Plan's unconstitutional effects on property, but the administrative remedy was problematic because it only allowed for the minimum necessary relief to raise the value of the property to forty percent of its pre-regulation value. See Monroe Cty. v. Gonzalez, 593 So. 2d 1143, 1144 (Fla. 3d DCA 1992) (affirming the circuit court's finding that the 1986 Plan's beneficial use determination was not an adequate remedy because it did not provide for just compensation as required by the Fifth Amendment to

3

the United States Constitution and Article X, section 6 of the Florida Constitution). Further, the beneficial use provisions required property owners to attempt to sell their property for forty percent of its pre-regulation value before being eligible to apply for relief. Id. The Beyers never challenged the 1986 regulations under this flawed beneficial use determination process.

- **1996**: The County adopted a revised plan—the Year 2010 Comprehensive Plan (the "2010 Plan"). Under this Plan, the Beyers' property is classified as a "bird rookery." Under this classification, the only permitted use of the property is "temporary primitive camping by the owner, in which no land clearing or other alteration of the island occurs[.]" Monroe Cty. Year 2010 Comprehensive Plan, Policy 102.7.2.

    Revised beneficial use procedures allow property owners to "apply for relief from the literal application of applicable land use regulations or of this plan when such application would have the effect of denying all economically reasonable use of [their] property[.]" Id., Policy 101.18.5. "The relief granted shall be the minimum necessary to avoid a 'taking' of the property under state and federal law." Id.

- **1997**: The Beyers submitted a beneficial use application along with the applicable fee to the County.

4

- **1999**: The City of Marathon (the "City") was incorporated, and the Beyers' property became part of the City. As a condition of incorporation, the City adopted the County's 2010 Plan. Up to this point, the County had taken no action on the Beyers' beneficial use application.

- **2002**: The Beyers submitted a new application and paid another application fee ($3,000) because the City refused to process the pending County application.

- **2005**: The Beyers' cause was finally heard by a Beneficial Use Special Master, nearly nine years after the application was first submitted. The Special Master found that "[o]ther than the Applicant being allowed to enter onto the property to camp, there is absolutely no allowable use of the property" under the 2010 Plan. The Special Master also found that the permitted camping "would not constitute reasonable economic value to the Applicant in light of their investment in the property." In spite of these findings, however, the Special Master recommended denying the Beyers' application because "[t]he Applicant has been adequately compensated by the issuance of 16 ROGO[1] points[.]" The City Council adopted these findings and recommendations.

---

[1] ROGO (Rate of Growth Ordinance) establishes rules and procedures for the process of receiving building permits in Monroe County. This process controls growth with a competitive point system that allocates the limited number of development permits available annually. See generally, Monroe Cty., Fl. Land.

The Beyers, having exhausted their administrative remedy, brought an inverse condemnation action against the City, alleging that they "have been deprived of all or substantially all, reasonable economic use of the subject property."

- **2008**: The circuit court grants final summary judgment in favor of the City (and the State of Florida, a third party defendant) concluding that the statute of limitations had run on the Beyers' taking claim. The Beyers appealed.

- **2010**: We reversed and remanded, finding that the Beyers did not bring a facial taking challenge but rather an as-applied taking challenge for which the statute of limitations had not run. Beyer v. City of Marathon, 37 So. 3d 932 (Fla. 3d DCA 2010) ("Beyer I").

- **2012**: On remand, the circuit court again granted summary judgment in favor of the City and State on the ground that the Beyers failed to establish reasonable investment-backed expectations and, alternatively, under the laches doctrine. The Beyers again appealed.

- **2013**: We concluded that the laches doctrine did not bar the Beyers' claim, but we nevertheless affirm summary judgment on the basis that the Beyers failed to establish reasonable investment-backed expectations. Beyer v. City

Dev. Code ch. 138.

6

of Marathon, 38 Fla. L. Weekly D2286 (Fla. 3d DCA Nov. 6, 2013) ("Beyer II").  The Beyers filed a timely motion for rehearing *en banc*.

## ANALYSIS

The Takings Clause is clear and concise: "nor shall private property be taken for public use, without just compensation."  U.S. Const. amend. V.  Regrettably, regulatory takings jurisprudence is cryptic and convoluted.  The United States Supreme Court, in an effort to clarify its first regulatory takings test—outlined in Penn Central Transportation Co. v. City of New York, 438 U.S. 104 (1978)—has left in its wake a collection of incongruous and inadequate takings inquiries.  It is no wonder, then, that this Court's brief Beyer II opinion flounders, but in its struggle for coherence, Beyer II further muddies the already murky waters.  I write this dissent from the denial of the motion for rehearing *en banc* in the hopes that at some point in the not too distant future this court will embrace a less turbid, and more constitutionally sound, regulatory takings framework.

### Categories of Takings Challenges

Before engaging in a taking analysis, it is useful to determine the category of the challenge to the regulatory action.  There are three[2] main categories of

---

[2] A fourth category involves "special application of the 'doctrine of unconstitutional conditions,' which provides that 'the government may not require a person to give up a constitutional right . . . in exchange for a discretionary benefit conferred by the government where the benefit has little or no relationship to the property.'"  Lingle, 544 U.S. at 547 (quoting Dolan v. City of Tigard, 512 U.S. 374, 385 (1994)); see also Nollan v. Cal. Coastal Com'n, 483 U.S. 825 (1987).

regulatory takings challenges. <u>Lingle v. Chevron U.S.A. Inc.</u>, 544 U.S. 528, 538 (2005). Two categories of regulatory action impose such a severe burden on private property rights that they are generally deemed *per se* takings (also referred to as categorical takings). <u>Id.</u> The first occurs when a regulation "requires an owner to suffer a permanent physical invasion of her property." <u>Id.</u>; <u>see also</u> <u>Loretto v. Teleprompter Manhattan CATV Corp.</u>, 458 U.S. 419 (1982). The second type of *per se* taking "applies to regulations that completely deprive an owner of '*all* economically beneficial us[e]' of her property." <u>Lingle</u>, 544 U.S. at 538 (alteration in original) (quoting <u>Lucas v. S. Carolina Coastal Council</u>, 505 U.S. 1003 (1992)). "Outside these two relatively narrow categories . . . regulatory takings challenges are governed by the standards set forth in [<u>Penn Central</u>]." <u>Id.</u>

The Beyers brought a *per se*/categorical taking challenge alleging a deprivation of all, or substantially all, economic use of their land (a <u>Lucas</u>-type total regulatory taking claim). <u>See</u> <u>Lucas</u>, 505 U.S. 1003. In <u>Beyer I</u> this court erroneously conflated the Beyers' *per se*/categorical challenge with something else entirely—a facial taking challenge. 37 So. 3d at 934. Under the mistaken belief that a *per se*/categorical taking was equivalent to a facial taking, <u>Beyer I</u> reframed the Beyers' claim, presumably as one governed by <u>Penn Central</u>,[3] to overcome the

---

[3] <u>Beyer I</u> never mentions <u>Penn Central</u>, but the opinion seems to suggest that the court considered the Beyers' reframed "as-applied taking" challenge equivalent to a <u>Penn Central</u> taking challenge. On remand, the circuit court recognized that the Beyers had alleged a <u>Lucas</u>-type taking, but based on <u>Beyer I</u>'s holding, the court

8

statute of limitations that would have precluded the Beyers from bringing a facial taking challenge. In effect, <u>Beyer I</u> held that the Beyers were not permitted to allege a deprivation of all economic use because such a challenge would be precluded by the statute of limitations. <u>Beyer II</u> perpetuates this misconception.[4]

---

ostensibly analyzed the Beyers' claim under <u>Penn Central</u>. On appeal, <u>Beyer II</u> likewise recognized that the Beyers' "complaint asserted that they have been deprived of all or substantially all reasonable economic use of the property[,]" but while the opinion briefly mentions <u>Penn Central</u>, the analysis seems rooted in the vested rights doctrine, which is distinct from a Takings Clause analysis under <u>Penn Central</u>.

[4] This confusion likely stems in large part from the United States Supreme Court's now repudiated reliance on due process precedents in Takings Clause cases. In <u>Agins v. City of Tiburon</u>, 447 U.S. 255 (1980), abrogated by <u>Lingle</u>, 544 U.S. 528, the Court held that "[t]he application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests[.]" Under this framework, a regulation could effect a taking by its mere enactment if it did not substantially advance a legitimate state interest; its effects on the property would be immaterial. Facial taking challenges were brought under <u>Agins'</u> formula since the "substantially advances" inquiry was thought to be separate from <u>Penn Central</u> or any of the other tests outlined above, which often require an inquiry into the actual burden imposed on property rights. See <u>Lingle</u>, 544 U.S. 528. In <u>Lingle</u>, a unanimous Court held that the "substantially advances" formula was "doctrinally untenable" and "is not a valid method of discerning whether private property has been 'taken' for the purposes of the Fifth Amendment." <u>Id.</u> at 542. This is because "the 'substantially advances' inquiry reveals nothing about the *magnitude or character of the burden* a particular regulation imposes upon private property rights. Nor does it provide any information about how any regulatory burden is *distributed* among property owners. In consequence, this test does not help to identify those regulations whose effects are functionally comparable to government appropriation or invasion of private property; it is tethered neither to the text of the Takings Clause nor to the basic justification for allowing regulatory actions to be challenged under the Clause." <u>Id.</u> Since this suggests most takings claims under the Takings Clause involve an inquiry into the actual effects of the regulation (as-applied), it is unclear what role facial takings challenges have after <u>Lingle</u>.

That <u>Beyer I</u> and <u>Beyer II</u> are mistaken on this point is clear from <u>Lucas</u>, which is the leading *per se*/categorical "total regulatory takings" case. In <u>Lucas</u>, the property owner brought an **as-applied challenge**, not a facial taking challenge, under the theory that he had been deprived of all economically viable use of his property. 505 U.S. at 1042 n.4 ("Here, of course, Lucas has brought an as-applied challenge."). Similarly, the Beyers allege that the 2010 Plan—**as applied to their property**—effects a *per se*/categorical taking because it deprives them of all economic use of their land.

Had the Beyers brought a facial taking challenge, there would have been no need for them to waste their time and money on a beneficial use determination because a facial taking claim alleges that the mere enactment of a regulation effects a taking regardless of any determination as to the regulation's actual impact on the property in question. <u>See</u> <u>Suitum v. Tahoe Reg'l Planning Agency</u>, 520 U.S. 725, 736 (1997) ("Such 'facial' challenges to regulation are generally ripe the moment the challenged regulation or ordinance is passed, but face an 'uphill battle,' since it is difficult to demonstrate that 'mere enactment' of a piece of legislation 'deprived [the owner] of economically viable use of [his] property.'" (citations omitted)); <u>Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.</u>, 452 U.S. 264, 295 (1981) ("Because appellees' taking claim arose in the context of a facial challenge, it presented no concrete controversy concerning either application of the Act to

10

particular surface mining operations or its effect on specific parcels of land. Thus, the only issue properly before the District Court and, in turn, this Court, is whether the 'mere enactment' of the Surface Mining Act constitutes a taking."). This fundamental misunderstanding of the distinction between a facial taking and a Lucas-type total regulatory taking has unfortunately engendered a confused and tortured analysis of the Beyers' taking claim.

### The Beyers' Taking Claim

It is important to recognize at the outset that although the various takings tests outlined above are not particularly coherent, they share a common purpose: "to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." Lingle, 544 U.S. at 539; see also Penn Cent., 438 U.S. at 124 ("[T]his Court, quite simply, has been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons."). In its attempt to make sense of a genuinely enigmatic regulatory takings jurisprudence, Beyer II appears to have lost sight of this overarching purpose. In short, Beyer II fails to see the proverbial forest for the trees.

Although the Beyers brought a <u>Lucas</u>-type challenge alleging the deprivation of all economic use of their land, <u>Beyer I</u> went to great lengths to transform the Beyers' categorical challenge into one controlled by the ad hoc, factual inquiry set forth <u>Penn Central</u>.[5]  This was unnecessary since the Beyers' as-applied categorical challenge was not yet barred by the statute of limitations.  Altering the Beyers' claim resulted in a refusal to adequately consider the economic impact of the regulation by both the circuit court on remand and this court in <u>Beyer II</u>.  Further, even if the regulation's economic impact were not sufficiently burdensome to give rise to a total regulatory taking claim, both <u>Penn Central</u> analyses are deeply flawed and ignore applicable Supreme Court precedent for irrelevant case law.

1.  <u>The Total Taking Inquiry (Lucas)</u>

In <u>Lucas</u>, a property owner purchased two residential beachfront lots that were subsequently rendered undevelopable by the state's enactment of the "Beachfront Management Act."  505 U.S. at 1006.  As in this case, the owner did not challenge the validity of the Act as a lawful exercise of the state's police power, "but contended that the Act's complete extinguishment of his property's value entitled him to compensation."  <u>Id.</u> at 1009.  Relying, in part, on Justice Holmes's "oft-cited maxim" in <u>Pennsylvania Coal Co. v. Mahon</u>, 260 U.S. 393, 415 (1922), that "[t]he general rule at least is that while property may be regulated

---

[5] <u>See</u> <u>supra</u> note 3.

to a certain extent, if regulation goes too far it will be recognized as a taking," the Supreme Court formulated a new categorical rule: "when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." Lucas, 505 U.S. at 1019. Although it is clear that the focus of this "total taking" inquiry is on the economic impact of the regulation, this potentially determinative factor seems to have been overlooked by the circuit court and Beyer II.

Since the Beyers obtained a beneficial use determination that specifically considered the permitted economic uses of their property under the 2010 Plan, inquiry into the economic impact is rather straightforward. According to the Special Master, "[o]ther than the Applicant being allowed to enter into the property to camp, **there is absolutely no allowable use of the property under the City of Marathon Land Development Regulations**." In essence, the Beyers are required to leave their property in its natural state. Cf. Lucas 505 U.S. at 1018 (explaining "that regulations that leave the owner of land without economically beneficial or productive options for its use—typically, as here, [require] land to be left substantially in its natural state"). This is no different from the beachfront property in Lucas, which was found to have been deprived of all economically beneficial use.[6] Id. at 1020. Indeed, the Beyers' only allowable use for "temporary primitive

13

camping by the owner, in which no land clearing or other alteration of the island occurs" actually leaves them worse off than the property owner in <u>Lucas</u> because the Beyers would not even be permitted to stay permanently on their island, let alone live in a moveable trailer. <u>See</u> <u>id.</u> at 1044 (Blackmun, J., dissenting) ("Petitioner can picnic, swim, camp in a tent, or live on the property in a movable trailer.").

Unfortunately, despite the unmistakable parallels between the economic impact in <u>Lucas</u> and the economic impact on the Beyers' property, the Beyers' challenge was never considered under <u>Lucas</u>'s total regulatory takings framework. To add insult to injury, although the economic impact here is tremendously burdensome, it does not appear to have been considered in the context of the <u>Penn Central</u> analysis either. Even assuming for the sake of argument that the 2010 Plan did not give rise to a <u>Lucas</u>-type total regulatory taking because it did not deprive the Beyers of all or substantially all[7] economically beneficial use, the regulation's economic impact would still be a necessary factor in the <u>Penn Central</u> inquiry. As Justice Scalia, writing for the majority in <u>Lucas</u>, explained:

---

[6] This was based on an unreviewed state trial court finding.

[7] In Florida, the "substantially all" language is often added to the <u>Lucas</u> formulation. <u>See, e.g.</u>, <u>Tampa-Hillsborough Cty. Expressway Auth. v. A.G.W.S. Corp.</u>, 640 So. 2d 54, 58 (Fla. 1994), as clarified (June 23, 1994) ("A taking occurs where regulation denies substantially all economically beneficial or productive use of land."). This suggests a slightly less demanding standard in Florida than the one in <u>Lucas</u>.

Justice STEVENS criticizes the "deprivation of all economically beneficial use" rule as "wholly arbitrary," in that "[the] landowner whose property is diminished in value 95%[8] recovers nothing," while the landowner who suffers a complete elimination of value "recovers the land's full value." **This analysis errs in its assumption that the landowner whose deprivation is one step short of complete is not entitled to compensation. Such an owner might not be able to claim the benefit of our categorical formulation, but, as we have acknowledged time and again, "[t]he economic impact of the regulation on the claimant and . . . the extent to which the regulation has interfered with distinct investment-backed expectations" are keenly relevant to takings analysis generally.**

505 U.S. at 1019 n.8 (emphasis added) (citing Penn Cent., 483 U.S. at 124).

2. The Ad Hoc, Factual Inquiry (Penn Central)

In Penn Central, the United States Supreme Court identified several factors that "have served as the principal guidelines for resolving regulatory takings claims that do not fall within the . . . Lucas rules." Lingle, 544 U.S. at 539. As the Supreme Court has explained:

Where a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on a complex of factors including the regulation's economic effect on the landowner, the extent to which the

---

[8] If a 95% diminution in value is considered "one step short of complete," the Beyers are about as close as one could possibly get to complete since their property has diminished in value by at least 98.7%. In 1970, the Beyers purchased their property for $70,000. As a result of the various regulations, the appraisal value of the Beyers' land has plummeted to a mere $900, which is only about 1.3 percent of the original purchase price.

15

> regulation interferes with reasonable investment-backed expectations, and the character of the government action.

Palazzolo v. Rhode Island, 533 U.S. 606, 617 (2001) (citing Penn Cent., 483 U.S. at 124).

Both the circuit court and Beyer II claim to evaluate the Beyers' taking challenge under Penn Central. Yet, despite the Supreme Court's insistence that no individual Penn Central factor be singled out as determinative, the circuit court and Beyer II did just that, brushing aside the undoubtedly relevant economic impact factor and focusing solely on "reasonable investment-backed expectations." See Palazzolo, 533 U.S. at 634 (O'Connor, J., concurring) ("The court erred in elevating what it believed to be '[petitioner's] lack of reasonable investment-backed expectations' to 'dispositive' status. Investment-backed expectations, though important, are not talismanic under Penn Central. Evaluation of the degree of interference with investment-backed expectations instead is one factor that points toward the answer to the question whether the application of a particular regulation to particular property 'goes too far.'" (citation omitted) (alteration in original)); Lingle, 544 U.S. at 540 ("And the Penn Central inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests.").

To further complicate matters, the cursory analyses of "reasonable investment-backed expectations" are confused and fundamentally flawed. Both

16

the circuit court's and Beyer II's findings that the 2010 Plan did not interfere with the Beyers' reasonable investment-backed expectations are based on two unsound arguments.  First, the Beyers waited too long to assert their constitutional rights in the face of ever tightening restrictions thereby forfeiting any expectations to develop their land.  And second, the Beyers failed to produce any evidence of their subjective expectations.  A third perplexing justification is raised only in Beyer II: that the award of ROGO points satisfied the Beyers' investment-backed expectations.  These three arguments are treated in turn.

a.  Prolonged Inaction

The prolonged inaction argument is based on the misunderstanding that regulations passed after the acquisition of property, if not challenged quickly enough, diminish a property owner's expectations so as to extinguish constitutionally protected property rights.  The argument ignores the "investment-backed" qualifier and looks to a property owner's non-investment-backed expectations at an unspecified point in time within a post-acquisition regulatory regime.  Cf. Daniel R. Mandelker, Investment-Backed Expectations in Taking Law, 27 Urb. Law. 215, 235-36 (1995) ("Investment-backed expectations held by property owners arise at the time of purchase and the information they have then about their property gives them meaning.").  This, of course, creates uncertainty since expectations could be widely variable and without the "investment-backed"

17

requirement, there is nothing that dictates when a property owner's expectations ought to be evaluated. Although the precise meaning of the reasonable investment-backed expectations factor is hardly clear,[9] it is not quite as nebulous as this "prolonged inaction" theory would suggest.

At its core, the theory is predicated on the mistaken belief that notice of post-acquisition regulations is a relevant indicium of investment-backed expectations. This approach is not supported by federal takings jurisprudence, and it is undermined by Supreme Court precedent. For example, in <u>Palazzolo</u>, the Supreme Court held that even regulations passed **before** the acquisition of property do not necessarily have a detrimental impact on the reasonable investment-backed expectations of subsequent owners who take title **with notice** of the regulations:

> The Takings Clause . . . in certain circumstances allows a landowner to assert that a particular exercise of the State's regulatory power is so unreasonable or onerous as to compel compensation. Just as a prospective enactment, such as a new zoning ordinance, can limit the value of land without effecting a taking because it can be understood as reasonable by all concerned, **other enactments are unreasonable and do not become less so through passage of time or title**. Were we to accept

---

[9] <u>See</u> J. David Breemer & R. S. Radford, <u>The (Less?) Murky Doctrine of Investment-Backed Expectations After Palazzolo, and the Lower Courts' Disturbing Insistence on Wallowing in the Pre-Palazzolo Muck</u>, 34 Sw. U.L. Rev. 351, 352 (2005) ("The Supreme Court's regulatory takings jurisprudence is one of the most heatedly divisive topics in contemporary constitutional law. One point, on which all sides agree, however, is that the meaning and significance of 'investment-backed expectations' is among the most baffling elements of this confusing and seemingly schizophrenic doctrine." (citations omitted)).

the State's rule, the postenactment transfer of title would absolve the State of its obligation to defend any action restricting land use, no matter how extreme or unreasonable. **A State would be allowed, in effect, to put an expiration date on the Takings Clause. This ought not to be the rule**. Future generations, too, have a right to challenge unreasonable limitations on the use and value of land.

533 U.S. at 627 (emphasis added).  This being the case, the Beyers, who were not on notice of the regulations now being challenged at the time of acquisition, *a fortiori*, have a right to challenge the alleged unreasonable limitation on the use and value of their land.  Notice of regulations passed **after** the acquisition of property does not intrude on this right.

Since the "prolonged inaction" argument finds no basis in federal takings jurisprudence, it should come as no surprise that the case cited in support of this approach by both the circuit court[10] and <u>Beyer II</u> is not a regulatory takings case but a vested rights case.[11]  <u>See</u> <u>Monroe Cty. v. Ambrose</u>, 866 So. 2d 707 (Fla. 3d

---

[10] The circuit court also cites a federal takings case, <u>Good v. United States</u>, 189 F.3d 1355 (Fed. Cir. 1999), for the proposition that a property owner who waited "seven years, watching as the applicable regulations got more stringent" lacked reasonable investment-backed expectations based on such "prolonged inaction." The court's reliance on <u>Good</u>, however, is misplaced.  <u>Good</u>, a pre-<u>Palazzolo</u> case, is quite clear that it was not the seven year delay that had a detrimental effect on the property owner's "reasonable investment-backed expectations" but, rather, the regulatory environment that existed at the time the land was acquired.  <u>Id.</u> at 1363 ("While **Appellant's prolonged inaction does not bar his takings claim**, it reduces his ability to fairly claim surprise when his permit application was denied. Appellant was aware **at the time of purchase** of the need for regulatory approval to develop his land." (emphasis added)).

[11] Ordinarily, once a vested right has been established, it is protected not by the

19

DCA 2003).  It is true, as both the circuit court and <u>Beyer II</u> assert, that landowners cannot establish a vested right without taking steps to develop their land.  <u>See</u> <u>id.</u> at 711 ("If the Landowners did not start development prior to the enactment of these land regulations, they acted at their own peril in relying on the absence of zoning ordinances.").  But the Beyers are not bringing a claim or seeking a remedy under the vested rights doctrine, nor do they need to.  Vested rights are conceptually distinct from the property rights at issue in this case.[12]  It is therefore perplexing that both the circuit court and <u>Beyer II</u> rely on such an incongruous framework to find that the Beyers lacked reasonable investment-backed expectations.

In a nutshell, the vested rights doctrine is a creature of state law[13] that prevents the government from interfering with a landowner's right to complete

---

Takings Clause, but by the Due Process Clause.  <u>See</u> <u>Maronda Homes, Inc. v. Lakeview Reserve Homeowners Ass'n, Inc.</u>, 127 So. 3d 1258, 1272 (Fla. 2013) ("These constitutional due process rights protect individuals from the retroactive application of a substantive law that adversely affects or destroys a vested right; imposes or creates a new obligation or duty in connection with a previous transaction or consideration; or imposes new penalties.").

[12] "While vested rights may be a clear way for property owners to obtain enforceable expectations, <u>see</u> [Mandelker, <u>supra</u> p. 16, at 237-38], a rule that equates the two doctrines is too narrow and would result in insufficient protection of property interests."  Robert M. Washburn, <u>"Reasonable Investment-Backed Expectations" As A Factor in Defining Property Interest</u>, 49 Wash. U.J. Urb. & Contemp. L. 63, 96 (1996); <u>see also</u> Breemer, <u>supra</u> note 9, at 396 ("[I]t is unfair to hinge reasonable expectations on the commencement of development before regulation because this effectively requires federal takings claimants to establish vested rights under state law . . . . But no federal court has ever held that state law vested rights are a necessary condition for acquisition of federal reasonable expectations.").

[13] Vested rights are created by common law, statute, or contract.  <u>See</u> 10A Fla. Jur

20

development of property when there has been sufficient reliance on the regulatory climate in existence at the time development began. See Ambrose, 866 So. 2d at 710 (outlining the common law vested rights test). In contrast, the Beyers' constitutionally protected property rights at issue here are distinct from any governmental benefit granted by the state. See Nollan, 483 U.S. at 833 ("But the right to build on one's own property-even though its exercise can be subjected to legitimate permitting requirements-cannot remotely be described as a 'governmental benefit.'"); Andrea L. Peterson, The Takings Clause: In Search of Underlying Principles Part II Takings As Intentional Deprivations of Property Without Moral Justification, 78 Cal. L. Rev. 53, 61 (1990) (explaining that constitutionally protected property "includes the freedom to pursue economically advantageous activities even when no law affirmatively grants such a right.").

The fact that these are distinct rights is recognized by the primary case cited by both the circuit court and Beyer II. [14] See Ambrose, 866 So. 2d at 712 (explaining that although subsequently enacted regulations apply to landowners who do not have vested rights, "to the extent that these regulations render any of the Landowners' property practically useless, the Landowners are entitled to

---

2d Constitutional Law § 378.

[14] The regulations under which the Beyers' beneficial use determination was made also distinguish between a vested rights determination (Policy 101-18.2) and a beneficial use procedure for total regulatory takings (Policy 101.18.5.1). See also Marathon, Fla., Code of Ordinances art. 18 (2015) ("Beneficial Use Determinations"); id. art. 19 (2015) ("Vested Rights Determinations").

21

compensation"); see also § 380.08, Fla. Stat. ("Nothing in this chapter authorizes any governmental agency to adopt a rule or regulation or issue any order that is unduly restrictive or constitutes a taking of property without the payment of full compensation, in violation of the constitutions of this state or of the United States."). As these are distinct property interests, the Beyers do not need to establish a vested right for there to be a taking that requires "full compensation."

b. Lack of Evidence

The second argument advanced by the circuit court and Beyer II is that the Beyers' failure to provide evidence of their particular investment-backed expectations makes summary judgment in favor the City appropriate. This narrow emphasis on subjective expectations is misplaced. The requirement that "investment-backed expectations" be reasonable requires an objective evaluation. See Lucas, 505 U.S. at 1035 ("The expectations protected by the Constitution are based on objective rules and customs that can be understood as reasonable by all parties involved."); Res. Investments, Inc. v. United States, 85 Fed. Cl. 447, 511 (2009) ("The investment-backed expectations prong requires 'an objective, but fact-specific inquiry into what, under all the circumstances, the [landowner] should have anticipated.' . . . '[A] party's subjective expectation is irrelevant to whether that expectation is reasonable.'" (quoting Cienega Gardens v. United States, 331 F.3d 1319, 1346 (Fed. Cir. 2003))).

Although the Supreme Court has provided sparse guidance as to the application of the expectations factor, one significant objective criterion that shapes a property owner's expectations is "the regulatory regime in place at the time the claimant acquires the property at issue." Palazzolo, 533 U.S. at 633 (O'Connor, J., concurring). On this point, it is undisputed that when the Beyers purchased their property, it was zoned "General Use," which allowed one single family home per acre. In contrast, under the 2010 Plan, the Beyers are not allowed to alter the island from its natural state whatsoever. This is one major objective fact that helps establish the Beyers' "reasonable investment-backed expectations," and it is undoubtedly sufficient for the Beyers' claim to survive summary judgment.

It is therefore inaccurate to assert, as do the circuit court and Beyer II, that there is no evidence of investment-backed expectations. Indeed, both the circuit court and Beyer II recognize that expectations can be shaped by a regulatory regime since both conclude that the Beyers did not have reasonable expectations due, at least in part, to the ever-tightening restrictions on their land.[15] It is more than a little perplexing that the circuit court and Beyer II seem to have no trouble concluding that the Beyers' expectations were defined by post-acquisition

_____

[15] As has been already been explained, this approach errs in its timing, but it is correct in its observation that expectations can be informed by the regulatory climate.

23

regulations, but they are at a complete loss when it comes to determining the Beyers' investment-backed expectations in light of the lack of restrictions that were in place when the Beyers purchased their property—i.e. at the time of investment.

c. ROGO Points

Almost as an afterthought, Beyer II concludes that the City's award of ROGO points "reasonably meets the Beyers' economic expectations[.]" This is a puzzling assertion since it seems to undermine the opinion's findings elsewhere that the Beyers did not have reasonable investment-backed expectations. After all, how could an award of ROGO points meet non-existent expectations? In any event, Beyer II appears to rely on the Special Master's finding that the Beyers have "been adequately compensated by the issuance of 16 ROGO points." Although it is not clear what the Special Master considered the points compensation for, if they are compensation in the takings context, the Constitution requires not that the compensation merely be adequate, but that the compensation be "just." See Palazzolo, 533 U.S. at 631 (2001) ("Assuming a taking is otherwise established, a State may not evade the duty to compensate on the premise that the landowner is left with a token interest.").

Moreover, bearing in mind that Beyer II affirms the circuit court's grant of summary judgment, there is a much more profound problem with Beyer II's

24

cursory reliance on ROGO points: this justification was never raised in the City's motion for summary judgment or in any of the briefs on appeal, and it is plainly a contested fact. Indeed, the evidence for a ROGO points valuation in the record would be woefully inadequate to find no genuine issue as to this material fact.[16] The only evidence in the record is from the beneficial use hearing. There, the Assistant City Attorney testified that a "two point ROGO dedication lot can generate anywhere from 25 to $40,000" but conceded that he was not a real estate expert and that this figure was arrived at anecdotally and not derived from any economic analysis of the current marketplace. Further, the Special Master sustained the Beyers' objection to this testimony as improper hearsay evidence.

Since Beyer II improperly relied on this disputed issue of fact, the Beyers were caught by surprise and only able to address the issue in their motion for rehearing, where they argue that ROGO points have no market value. This is problematic because the record is insufficient to make a determination one way or the other. Consequently, the ROGO points valuation is not a fact upon which summary judgment ought to be based, and it is an improper justification for affirmance.

_____

[16] This is particularly true under Florida's summary judgment standard, which is more demanding than its federal counterpart. See, e.g., Piedra v. City of N. Bay Vill., 41 Fla. L. Weekly D1087 (Fla. 3d DCA May 4, 2016) ("If the record on appeal reveals the merest possibility of genuine issues of material fact, or even the slightest doubt in this respect, the summary judgment must be reversed.").

## CONCLUSION

Although the intricacies of the various takings inquiries are without a doubt complicated and imprecise, one thing is certain: the Beyers have been singled out to suffer significant economic injuries in the name of the public good. They purchased an island zoned for residential development that the government transformed into a "bird rookery." The only allowable use now is temporary, primitive camping (provided, incidentally, that no land clearing or alteration of the island occurs). If this is not a situation where justice and fairness require that economic injuries caused by public action be compensated by the government, I do not know what is. The decision of this Court that the Beyers have no constitutional taking claim against the City for what are indisputably excessive economic injuries is, well, for the birds. I hope that someday in the near future, this court reaffirms the notion that citizens have rights too. Accordingly, I respectfully dissent from the denial of the motion for rehearing *en banc*.

LAGOA and EMAS, JJ., concur.