# Third District Court of Appeal

## State of Florida

Opinion filed May 3, 2023.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D21-1987
Lower Tribunal No. 07-99-M
_____

**Rodney Shands, et al.,**
Appellants,

vs.

**City of Marathon, etc., et al.,**
Appellees.

An appeal from the Circuit Court for Monroe County, Mark H. Jones, Judge.

Pacific Legal Foundation, Jeremy Talcott, and Robert H. Thomas (Sacramento, CA), and Kathryn D. Valois (Palm Beach Gardens), for appellants.

Johnson, Anselmo, Murdoch, Burke, Piper & Hochman, P.A. and Michael T. Burke, and Hudson C. Gill (Fort Lauderdale), for appellees.

Before EMAS, HENDON, and MILLER, JJ.

MILLER, J.

This inverse condemnation appeal presents a novel issue regarding the role that transferred development rights ("TDRs") occupy in adjudicating a per se as-applied regulatory taking claim advanced under the landmark case of Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992). Appellants, the children of the late Dr. R.E. Shands, are the owners of Shands Key, an offshore island in the Florida Keys. Dr. Shands acquired the property in 1956, and, upon his death, title to the island passed to his wife. She, in turn, conveyed the property to appellants. In 1986, Monroe County changed Shands Key's zoning status from "General Use" to "Conservation Offshore Island." In 1999, appellee, the City of Marathon, incorporated and adopted Monroe County's regulations. An application to construct a dock to allow for increased island access was denied, and the zoning authority effectively foreclosed any use of the property, other than for beekeeping or personal camping. After unsuccessfully pursuing administrative avenues for relief, appellants filed suit, alleging a regulatory taking. They then sought partial summary judgment on the basis that the regulation, as applied, deprived them of all economically beneficial use of their property. Finding that an award of TDRs and Building Permit Allocation System ("BPAS") points, considered in tandem with the residual land value derived from personal recreation and beekeeping, precluded a per se as-

applied claim, the trial court denied the motion. The primary issue on appeal is the propriety of that ruling.[1]

## PROCEDURAL HISTORY

This dispute underscores the "cryptic and convoluted" nature of contemporary regulatory takings jurisprudence. See Ganson v. City of Marathon, 222 So. 3d 17, 20 (Fla. 3d DCA 2016) (Shepherd, J., dissenting). This is the third time this case has come before this court. The salient facts precipitating the filing of suit are as follows:

> Dr. R.E. Shands purchased the 7.9-acre Little Fat Deer Key in 1956, and seven acres of adjacent bay bottom in 1959, before any state land use policies existed. He died in 1963, and his wife inherited the property, now known as Shands Key. She conveyed title to their children, the appellants, in 1985. From the time it was purchased until 1986, Shands Key was within Monroe County jurisdiction and was zoned General Use.
>
> In 1986, Monroe County adopted the State Comprehensive Plan and development regulations that altered Shands Key's zoning status to Conservation Offshore Island (OS), and placed it in the Future Land Use category. When the City of Marathon incorporated in 1999, it adopted the 1986 Monroe County comprehensive land use plan, and Shands Key was within the City bounds. In 2005, the City adopted the City of Marathon Comprehensive Plan; the land use and zoning designations of Shands Key remained unchanged.
>
> In 2004, the Shands filed an application for a dock permit. The application was denied, referring to the City's prohibition on development in areas classified as high[-]quality hammocks, or

---

[1] Because the error associated with the partial summary judgment denial is dispositive, we decline to reach the other issues on appeal.

3

areas with known threatened or endangered species. The Shands then filed a Beneficial Use Determination (BUD) application as required by the City of Marathon Code of Ordinances, Article 18. The Special Master at the conclusion of the BUD hearing found that the Shands had reasonable economic investment-backed expectations that they could build a family residence on the Key, as planned in the late 1950s. The Special Master recommended that the City grant a building permit for a single family home exempt from the Rate Of Growth Ordinance (ROGO) requirements of 0.1 units per acre, or purchase the property for a mutually agreeable sum. After a public hearing, the Marathon City Council rejected the Special Master's recommendations and denied the Shands' BUD application.

The Shands then brought suit against the City, claiming that the City's acts resulted in an as-applied regulatory taking of their property without just compensation, in violation of state and federal law.

Shands v. City of Marathon (Shands II), 261 So. 3d 750, 751–52 (Fla. 3d DCA 2019) (quoting Shands v. City of Marathon (Shands I), 999 So. 2d 718, 720–22 (Fla. 3d DCA 2008)).

Some additional procedural history is necessary. In the parties' first appeal, this court reversed a trial court order dismissing the case on statute of limitations grounds. Shands I, 999 So. 2d at 720. There, the court determined appellants' challenge was "as applied," rather than "categorical [or] facial," and therefore not barred by the statute of limitations. Id. at 725–26. In support of this characterization, the court reviewed the relevant ordinance and noted that it provided for "low intensity residential uses . . .

4

that can be served by cisterns, generators and other self-contained facilities," and "[d]etached residential dwellings." Id. at 724. It further observed that TDRs, including ROGO allocation points, were available.[2] Id.

On remand, the City successfully moved for summary judgment on the complaint, contending that the availability of TDRs and BPAS points rendered the facts indistinguishable from Beyer v. City of Marathon, 197 So. 3d 563 (Fla. 3d DCA 2013). This court once again reversed on appeal, finding the City failed to establish the value of the TDRs associated with the property. See Shands II, 261 So. 3d at 753.

Following the second remand, appellants moved for partial summary judgment, alleging they had raised a viable per se, as-applied challenge under Lucas. In support of their motion, appellants attached sworn testimony establishing that the zoning change effectively limited the use of the property to beekeeping or personal camping. This limitation, they argued, rendered the property "economically idle" under Lucas. 505 U.S. at 1019.

Invoking Shands I and II and other precedent, the City countered summary judgment on the ground that the award of TDRs, including the allocation of BPAS points, infused the property with value, precluded a per

---

[2] The affidavit-based submissions outline the availability of TDRs and BPAS points, rather than ROGOs.

se finding under Lucas.[3]  The trial court denied the motion.  The case subsequently proceeded to a two-day non-jury trial, at the conclusion of which the court found appellants failed to establish a taking under the ad hoc multi-factored analysis set forth in Penn Central Transportation Co. v. City of New York, 438 U.S. 104 (1978).  This appeal followed.[4]

---

[3] Because the government may not evade the duty to compensate on the basis that the landowner retains a token interest in the property, we reject the circular and conclusory assertion that a hypothetical acquisition of the property for beekeeping or personal camping precluded a per se as-applied claim.  See Bridge Aina Le'a, LLC v. Land Use Comm'n, 950 F.3d 610, 628 (9th Cir. 2020) ("[T]he relevant inquiry for us is whether the land's residual value reflected a token interest or was attributable to noneconomic use."), cert. denied, 141 S. Ct. 731 (2021); see also Res. Invs., Inc. v. United States, 85 Fed. Cl. 447, 486 (2009) ("Lucas . . . focuses on whether a regulation permits *economically viable use* of the property, not whether the property retains some value on paper."); Lost Tree Vill. Corp. v. United States, 787 F.3d 1111, 1117 (Fed. Cir. 2015) ("When there are no underlying economic uses, it is unreasonable to define land *use* as including the sale of the land. Typical economic uses enable a landowner to derive benefits from land ownership rather than requiring a landowner to sell the affected parcel."); State ex. rel. AWMS Water Sols., LLC v. Mertz, 165 N.E.3d 1167, 1181 (Ohio 2020) (finding that potential subletting of the property to a third party "does not rise to the level of an economically beneficial use under Lucas"); Nekrilov v. City of Jersey City, 45 F.4th 662, 671 n.3 (3d Cir. 2022) ("The plaintiffs are correct that the ability to sell a property does not always constitute an economically beneficial use."); Banker's Choice, LLC v. Zoning Bd. of Appeals of Cincinnati, 170 N.E.3d 923, 930 (Ohio Ct. App. 2021) ("However, an owner's ability to sell an affected property does not constitute an economically beneficial use.").

[4] As this appeal is from a final judgment, "the antecedent denial of summary judgment is reviewable." Tiger Point Golf & Country Club v. Hipple, 977 So. 2d 608, 610 (Fla. 1st DCA 2007).

## STANDARD OF REVIEW

Our review is de novo, as it entails the denial of partial summary judgment and resultant claim preclusion. Shands II, 261 So. 3d at 752. This case was decided under Florida's "old" summary judgment standard. As we explained in Feldman v. Schocket:

> Pursuant to the old standard, summary judgment was proper "if there [was] no genuine issue of material fact and if the moving party [was] entitled to a judgment as a matter of law." In accordance with this test, "the existence of any competent evidence creating an issue of fact, however credible or incredible, substantial or trivial, stop[ped] the inquiry and preclude[d] summary judgment, so long as the 'slightest doubt' [was] raised."

47 Fla. L. Weekly D1930–31 (Fla. 3d DCA Sept. 21, 2022) (alterations in original) (first quoting Volusia County v. Aberdeen at Ormond Beach, L.P., 760 So. 2d 126, 130 (Fla. 2000); and then quoting Bruce J. Berman & Peter D. Webster, Berman's Florida Civil Procedure § 1.510:5 (2020 ed.)).

## ANALYSIS

The Takings Clause of the Fifth Amendment, applicable to the states through the Fourteenth Amendment, commands: "[N]or shall private property be taken for public use, without just compensation." Amend. V, U.S. Const. Similarly, the Florida Constitution provides that "[n]o private property shall be taken except for a public purpose and with full compensation therefor paid." Art. X, § 6(a), Fla. Const. As the Supreme Court has explained, "[t]he aim of

7

the Clause is to prevent the government 'from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" E. Enters. v. Apfel, 524 U.S. 498, 522 (1998) (quoting Armstrong v. United States, 364 U.S. 40, 49 (1960)). Importantly, the Clause "does not proscribe the taking of property; it proscribes taking without just compensation." Florida Dept. of Transp. v. Mallards Cove, LLP, 159 So. 3d 927, 932 (Fla. 2d DCA 2015) (quoting Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 194 (1985)); see also Cedar Point Nursery v. Hassid, 141 S. Ct. 2063, 2071 (2021) (quoting Discourses on Davila, in 6 Works of John Adams 280 (C. Adams ed. 1851)) ("[P]roperty must be secured, or liberty cannot exist.").

The Fifth Amendment was historically understood to apply only to "direct government appropriation or physical invasion of private property." Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 537 (2005). Over a century ago, however, the Supreme Court inaugurated the concept of regulatory takings in the case of Pennsylvania Coal Co. v. Mahon, 260 U.S. 393 (1922). In Mahon, the Court recognized that the Takings Clause extended to overly burdensome regulations of property. Writing for an 8-1 Court, Justice Oliver Wendell Holmes observed that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." Id. at 415.

8

Identifying those regulations that go "too far" remains a thorny issue, but guiding principles emerge from two seminal Supreme Court decisions. In the first decision, Penn Central, the Court developed a framework for assessing partial regulatory takings claims. There, the Court articulated a fact-specific, ad hoc inquiry, consisting of the following three factors: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action. Penn Cent., 438 U.S. at 124; see also Keshbro, Inc. v. City of Miami, 801 So. 2d 864, 871 n.12 (Fla. 2001) ("Those regulations which fall short of effecting a categorical taking are appropriately analyzed under the ad-hoc factual inquiry outlined in [Penn Central].").

In the second decision, Lucas, the Court developed a rule applicable to "total" takings, defined as the "relatively rare situations where the government has deprived a landowner of all economically beneficial uses." Lucas, 505 U.S. at 1018; see also Bridge Aina Le'a, LLC v. Hawaii Land Use Comm'n, 141 S. Ct. 731, 731 (2021) (Thomas, J., dissenting from denial of certiorari) (citing Carol Necole Brown & Dwight H. Merriam, On the Twenty-Fifth Anniversary of Lucas: Making or Breaking the Takings Claim, 102 Iowa L. Rev. 1847, 1849–50 (2017)) ("[I]n more than 1,700 cases over a 25-year

period, there were only 27 successful takings claims under <u>Lucas</u>—a success rate of just 1.6%."). There the Court held that, "when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." <u>Lucas</u>, 505 U.S. at 1019.

Under <u>Lucas</u>, the "determinative factor" is whether the regulation effectively eliminates any economic use associated with the property. <u>Lingle</u>, 544 U.S. at 539. However, even where regulation deprives a property owner of all economically beneficial use, the government is still permitted to demonstrate that background principles of property and nuisance law support regulation. <u>Lucas</u>, 505 U.S. at 1029.

In the aftermath of <u>Penn Central</u>, <u>Lucas</u>, and their progeny, TDRs have emerged as a popular and effective tool for local governments to promote conservation efforts and urban growth management. Such rights typically benefit the landowner by allowing for expanded "development beyond the restricted level on [another] piece of land." Ralph A. DeMeo, <u>Transfer Development Rights</u>, <u>in</u> II Florida Environmental and Land Use Law ch. 23 (1996).

The significance of TDRs in the regulatory takings matrix has been sharply debated. Some legal experts have opined that TDRs are irrelevant

to the takings side of the equation because they do nothing to impact the nature and extent of the property interest taken by the government.[5]  Others have espoused the belief that TDRs necessarily mitigate the economic impact of regulation by infusing the property with value; therefore, they should be considered before determining whether the government has effectuated a taking.[6]

---

[5] See Richard D. Himberger, Transferable Development Rights, 43 Advocate 8, 12 (2000) (footnote omitted) ("If government enacts a zoning ordinance requiring a landowner to leave his real estate as open space, that regulation will emasculate all viable economic use in his land.  Under the Lucas Total Deprivation Rule, such a regulation would constitute a taking of private property requiring payment of just compensation.  This conclusion is not altered when a TDR program is added to the mix.  The fact that the owner receives part of his just compensation in the form of TDR sales proceeds does not change the fact the taking has occurred."); see also William Hadley Littlewood, Transferable Development Rights, TRPA, and Takings, the Role of TDRs in the Constitutional Takings Analysis, 30 McGeorge L. Rev. 201, 232 (1998) ("Applying TDRs to the takings side of the Fifth Amendment's protections will prove both unworkable and inequitable."); Samantha Peikoff Adler, Penn Central 2.0: The Takings Implications of Printing Air Rights, 2015 Colum. Bus. L. Rev. 1120, 1181 (2015) ("While TDRs have become an important investment option and land use currency, it is questionable whether they will ever be perceived the same as property rights in land.").

[6] See Arden H. Rathkopf et al., Relation to Constitutional Taking Claims— As Factor on Merits of Claim, in 3 Rathkopf's The Law of Zoning and Planning § 59:17 (4th ed.) ("[E]conomic value of available TDRs are to be considered in determining whether an owner is provided with a reasonable return on his investment and might possibly result in rejection of such a claim even where economically viable developmental uses of the particular restricted site are prohibited."); Jennifer Scro, Navigating the Takings Maze: The Use of Transfers of Development Rights in Defending Regulations Against Takings Challenges, 19 Ocean & Coastal L.J. 219, 238 (2014) ("[T]o

The Supreme Court has yet to clarify this conundrum. In a noteworthy concurrence in Suitum v. Tahoe Regional Planning Agency, 520 U.S. 725 (1997), Justice Scalia, joined by Justices O'Connor and Thomas, squarely addressed the issue. Concluding "the relevance of TDRs is limited to the compensation side of the takings analysis, and that taking them into account in determining whether a taking has occurred [would] render much of [the Court's] regulatory takings jurisprudence a nullity," id. at 750, the concurrence explained:

> TDRs, of course, have nothing to do with the use or development of the land to which they are (by regulatory decree) "attached." The right to use and develop one's own land is quite distinct from the right to confer upon someone else an increased power to use and develop *his* land. The latter is valuable, to be sure, but it is a new right conferred upon the landowner in exchange for the taking, rather than a reduction of the taking. In essence, the TDR permits the landowner whose right to use and develop his property has been restricted or extinguished to extract money from others. Just as a cash payment from the government would not relate to whether the regulation "goes too far" (i.e., restricts use of the land so severely as to constitute a taking), but rather to whether there has been adequate compensation for the taking;

maintain TDRs' continuing viability, courts should consider TDRs as a mitigating property right both in the takings analysis itself and for potential post-verdict compensation."); Paul Merwin, Caught Between Scalia and the Deep Blue Lake: The Takings Clause and Transferable Development Rights Programs, 83 Minn. L. Rev. 815, 847–48 (1999) (footnote omitted) ("TDR programs avoid the categorical takings rule of Lucas by providing landowners with an economic use of property. TDR programs meet the goals of the Takings Clause, and avoid many of the evils that takings law seeks to prevent.").

and just as a chit or coupon from the government, redeemable by and hence marketable to third parties, would relate not to the question of taking but to the question of compensation; so also the marketable TDR, a peculiar type of chit which enables a third party not to get cash from the government but to use his land in ways the government would otherwise not permit, relates not to taking but to compensation.

Id. at 747 (Scalia, J., concurring in part and concurring in judgment).

More recently, in Horne v. Department of Agriculture, 576 U.S. 350 (2015), Chief Justice Roberts, writing for the majority, invoked Scalia's concurrence in Suitum for the proposition that "once there is a taking, as in the case of a physical appropriation, any payment from the Government in connection with that action goes, at most, to the question of just compensation." Id. at 364. This is consistent with Justice Thomas's recent reiteration of the Lucas principle that "[a] regulation effects a taking . . . categorically whenever [it] . . . leaves *land* 'without economically beneficial or productive options for its *use*.'" Bridge Aina Le'a, 141 S. Ct. at 731 (Thomas, J., dissenting from denial of certiorari) (emphasis added) (citations omitted) (quoting Lucas, 505 U.S. at 1018).

Against this jurisprudential landscape, we examine the summary judgment record in the instant case. Appellants established that regulation deprived them of any use of the property, other than for beekeeping or personal camping. These do not constitute economically beneficial uses, as

13

"a State may not evade the duty to compensate on the premise that the landowner is left with a token interest." Palazzolo v. Rhode Island, 533 U.S. 606, 631 (2001). As Justice Scalia observed in his Suitum concurrence, any income associated with TDRs does not flow from the cultivation or development of the property in the traditional framework of ownership. Instead, the potential revenue is generated from the non-use of the property.

Consistent with this logic, while "[p]utting TDRs on the taking rather than the just compensation side of the equation . . . is a clever, albeit transparent, device that seeks to take advantage of a peculiarity of our Takings Clause jurisprudence," doing so allows the government to provide some compensation without the constitutional stricture of just compensation. Suitum, 520 U.S. at 748–49 (Scalia, J., concurring in part and concurring in judgment).

To reason otherwise would render Lucas nugatory. As William Handle Littlewood explained in Transferable Development Rights, TRPA, and Takings, the Role of TDRs in the Constitutional Takings Analysis:

> Although many commentators would not be concerned with this outcome, they fail to recognize the underlying rationale of the Lucas decision. The underpinning of Lucas is that regulatory schemes seeking to keep land in its natural state place such a burden on the landowner that even the most compelling state interest will not suffice absent just compensation. Inverse condemnation claims based on the reasoning in Lucas will become obsolete if we allow TDRs into the "takings" side of the

14

analysis. This will result because every regulatory scheme concerned with approaching the level of a taking will contain a provision allocating TDRs to the burdened landowners, thus circumventing <u>Lucas</u>.

Littlewood, <u>supra</u> note 5, at 225 (footnotes omitted).

Further, to the extent that the City invokes the law of the case or res judicata for the proposition that the <u>Lucas</u> claim has been previously adjudicated, neither the <u>Shands I</u> nor <u>Shands II</u> court directly considered the viability of the total as-applied regulatory taking claim under <u>Lucas</u>. The first panel effectively folded the entirety of the as-applied challenge into the <u>Penn Central</u> rubric. In so doing, the panel viewed <u>Lucas</u> as applicable only to "facial" challenges. This conclusion was incomplete and not quite precise.[7] "[A] *per se* taking challenge can be brought as either an as-applied or facial claim." <u>Goodwin v. Walton County Fla.</u>, No. 3:16-CV-364/MCR/CJK, 2018 WL 11413298, at *6 n.15 (N.D. Fla. Mar. 6, 2018). A per se facial claim, also

---

[7] This court painted the <u>Beyer</u> case with the same broad stroke and recast the landowner's challenge as a <u>Penn Central</u> claim. <u>See</u> <u>Ganson</u>, 222 So. 3d at 22–23 (Shepherd, J., dissenting) ("Although the Beyers brought a <u>Lucas</u>-type challenge alleging the deprivation of all economic use of their land, <u>Beyer I</u> went to great lengths to transform the Beyers' categorical challenge into one controlled by the ad hoc, factual inquiry set forth <u>Penn Central</u>. . . . Unfortunately, despite the unmistakable parallels between the economic impact in <u>Lucas</u> and the economic impact on the Beyers' property, the Beyers' challenge was never considered under <u>Lucas</u>'s total regulatory takings framework.").

characterized as a total facial claim, arises where "the mere enactment of a statute constitutes a taking." Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 494 (1987). Conversely, a per se as-applied claim rests on the allegation that "the particular impact of government action on a specific piece of property requires the payment of just compensation." Id. Indeed, the claim in Lucas was an as-applied, rather than a facial, challenge.

Compounding the confusion was the synonymous use by the panel of the words "categorical" and "facial." In this arena, a categorical claim invokes a per se or total regulatory taking. However, as we previously explained, such a taking may take the form of either a facial or an as-applied challenge. The first panel broadly glossed over this distinction and noted that no "facial, categorical" claim remained viable under Lucas—a conclusion unnecessary to its holding.

Like the first before it, the second panel viewed the claim through the lens of Penn Central and merely determined the valuation summary judgment record was insufficient to support a finding in favor of the City. See Shands I, 999 So. 2d at 727 ("On remand, it remains for the trial court to determine whether, given the Shands' economic expectations, the City's denial of the BUD application rises to the level of a compensable as-applied

16

taking under state and federal law."); Shands II, 261 So. 3d at 753 ("The trial court therefore properly treated this case as an 'as applied' challenge."). Thus, neither decision disposed of the Lucas as-applied claim.[8]

In accord with the foregoing analysis, we conclude that appellants established overly burdensome government regulation deprived them of "all economically beneficial uses" of their property.  Lucas, 505 U.S. at 1019. Consequently, they were entitled to an award of partial summary judgment on their per se as-applied Lucas claim.  We therefore reverse and remand for the trial court to vacate the final judgment, enter partial summary judgment in favor of appellants, and conduct further proceedings consistent with this opinion.

Reversed and remanded.

---

[8] See Bunn v. Bunn, 311 So. 2d 387, 389 (Fla. 4th DCA 1975) ("[A] purely gratuitious [sic] observation or remark made in pronouncing an opinion and which concerns some rule, principle or application of law not necessarily involved in the case or essential to its determination is obiter dictum, pure and simple.  While such dictum may furnish insight into the philosophical views of the judge or the court, it has no precedential value."); First Protective Ins. Co. v. Hess, 81 So. 3d 482, 485 (Fla. 1st DCA 2011) ("We find the relevant language . . . dicta and, therefore, not binding under the facts in this case."); State ex rel. Biscayne Kennel Club v. Bd. of Bus. Regul. of Dep't of Bus. Regul. of State, 276 So. 2d 823, 826 (Fla. 1973) ("The statement of the District Court of Appeal in its opinion requiring the allocation of dates to be on the fiscal year basis in the future was not essential to the decision of that court and is without force as precedent.").

17